# United States Court of Appeals
## For the First Circuit

---

No. 05-1833

ANTHONY OLSZEWSKI, III,

Petitioner, Appellant,

v.

LUIS SPENCER,

Respondent, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Torruella, Selya and Dyk,[*] Circuit Judges.

---

David J. Nathanson for the appellant.
Cathryn A. Neaves, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, was on brief, for the appellee.

---

October 20, 2006

---

[*]Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.    This is a habeas case.    The petitioner, Anthony Olszewski III ("Olszewski"), was convicted of first-degree murder in the Massachusetts state courts.    He claims that his due process rights were violated when the Commonwealth permitted the destruction of exculpatory evidence prior to trial and made improper statements in closing arguments at trial. Olszewski also seeks relief on the grounds that he received ineffective assistance of counsel and that the trial court improperly dismissed a sitting juror based on ex parte communications.    We conclude that none of these claims warrants habeas relief, and therefore affirm the district court's denial of the petition.

**I.**

Joanne Welch was murdered sometime between 7 and 9 P.M. on January 28, 1982.    Olszewski and Welch had been involved in a romantic relationship that ended approximately one month before Welch's murder.    Prior to the murder, Welch had begun dating another man, which upset Olszewski.    On the day of the murder, several of Olszewski's friends heard Olszewski threaten to kill Welch.    That same day, Welch told family members and coworkers that she planned to drive to Olszewski's house after work to retrieve her personal belongings and some money.    She intended to return home for dinner and expected a call from her new boyfriend to arrange a date for the evening of January 28.    Welch visited

Olszewski's house and retrieved her belongings, but never returned home.

On January 29, 1982, on Great Plains Road in West Springfield, Massachusetts, the police located shoes and earrings belonging to Welch along with two teeth, a strip of chrome automobile trim, and a belt hanging from a tree. The police found Welch's body seven miles away. She had fractures to her jaw and pelvis, bruising, abrasions, and several missing teeth. The teeth found on Great Plains Road appeared to be Welch's. Welch's injuries were consistent with blows from a fist or foot and strangulation. On January 30, the police found Welch's car parked next to a Westfield, Massachusetts bowling alley. There was blood, hair, and fiber belonging to Welch in the car, and a strip of chrome trim was missing from the passenger side.

Olszewski admitted that Welch came to his house on January 28; his defense was alibi during the period of time that the murder was committed. He claimed that Welch left his house around 6:30 that evening, and that between 7 and 9 P.M.,[1] he was in the company of his friend, Philip Strong. Olszewski met other friends around 9 P.M.

---

[1] Exactly when Olszewski allegedly met with Strong is unclear. The Supreme Judicial Court found that Olszewski "told the police that he was in the company of Philip Strong between 7 and 9 P.M." Commonwealth v. Olszewski, 416 Mass. 707, 710, 625 N.E.2d 529, 533 (1993). At trial, however, Officer Whitehead testified that Olszewski said that he met Strong at the Y.M.C.A. at 7:30 P.M.

On January 31, 1982, Strong provided the police with a written statement corroborating Olszewski's alibi. On February 15, 1982, the police questioned Strong a second time, and Strong admitted that the first statement was false. Contrary to established procedures, the police did not copy the first statement and left Strong alone with the only copy of the statement. Strong ripped it up and threw the pieces in the trash. Strong then provided the police with a second statement that stated that, on January 29, Olszewski told Strong that Olszewski had murdered Welch. The police did not attempt to retrieve the first statement until later that night when Officer Sypek looked in the trash for the pieces and found that the trash had already been emptied. The first statement was never recovered.

On February 12, 1983, Olszewski was convicted of Welch's murder based in large part on Strong's testimony. On direct appeal, the Massachusetts Supreme Judicial Court vacated the conviction and remanded the case based on the prosecution's use at trial of evidence that was lost or destroyed.[2] The Supreme Judicial Court instructed the trial court that on remand, under

---

[2] The lost evidence at issue on appeal included Strong's first statement, the belt, blood samples taken from the road and parking lot, a paint chip taken from Welch's skin, a carpet swatch taken from Welch's vehicle, an automobile window crank handle, and a plastic cup lid found in Welch's vehicle. Some of this evidence, but not Strong's first statement, was recovered after the Supreme Judicial Court's order but before the trial court conducted an evidentiary hearing.

-4-

Commonwealth v. Willie, 400 Mass. 427, 510 N.E.2d 258 (1987), "[f]or each piece of missing evidence shown to be potentially exculpatory, the judge must weigh the culpability of the Commonwealth and its agents, the materiality of the evidence, and the potential prejudice to the defendant." Commonwealth v. Olszewski, 401 Mass. 749, 757, 519 N.E.2d 587, 592 (1988). It is unclear whether the Supreme Judicial Court's decision to vacate was based in part on the destruction of Strong's first statement. On the one hand, there is language in the opinion directing the trial court to consider the destruction of Strong's first statement on the remand. On the other hand, the Supreme Judicial Court concluded that "the defense counsel fully described to the jury the circumstances of the making and the destruction of Strong's first statement. The defense thoroughly cross-examined, and effectively impeached, Strong. The judge properly admitted Strong's testimony."

Nonetheless on remand the trial court considered the remand order as extending to the destruction of Strong's first statement. The trial court held a series of hearings and suppressed certain evidence on the ground that the state destroyed the predicate physical evidence.[3] At the hearing, the trial judge considered whether the destruction of Strong's first statement

---

[3] The trial judge suppressed all results of tests conducted on blood stains found at Great Plains Road and beneath Welch's car in the bowling alley parking lot. The judge also suppressed the results of blood tests taken on the belt.

-5-

should be grounds for dismissing the indictment. The judge stated in his findings of fact:

> I do not believe that Captain Sypek and Detective Zielinksi were so obtuse that they did not realize that the first statement had been destroyed until after Strong had given his second statement and left the station and until after the wastepaper basket in the conference room had been emptied. On the contrary, I strongly suspect that they deliberately left the statement on the conference room table and left the room in the hope that Strong would destroy the statement and give a new one.

Nonetheless, in finding that the indictment should not be dismissed, the trial judge ruled that, although the police were "incredibly foolish," he did "not believe it was done maliciously." Leaving Strong alone with his first statement "did not amount to a bad faith effort to deprive the defendant of exculpatory evidence." After "[w]eighing the culpability of the police against the materiality of the evidence and the potential prejudice to the defendant" under Massachusetts law, the court denied Olszewski's motion to dismiss the indictment.

At the second trial, the judge allowed Olszewski to examine witnesses concerning the circumstances of the destruction of the statement; permitted Olszewski to cross-examine the police about the contents of the statement; and gave a jury instruction

regarding the lost statement.[4]  On February 5, 1990, Olszewski again was convicted of first-degree murder.  He was sentenced to life in prison.  On his second direct appeal to the Supreme Judicial Court, Olszewski argued, inter alia, that (1) Strong's testimony should have been excluded because Strong's original statement was destroyed; (2) the prosecutor made improper statements during closing arguments; and (3) the trial court's dismissal of a sitting juror based on ex parte communications between the juror and the court violated Olszewski's federal constitutional rights.  Commonwealth v. Olszewski, 416 Mass. 707, 625 N.E.2d 529 (1993).  The Supreme Judicial Court rejected these arguments and affirmed the conviction.

After the Supreme Judicial Court affirmed his conviction, Olszewski filed a motion for a new trial claiming that his trial counsel was ineffective for failing to call his father at a witness and that his appellate counsel was ineffective for failing to raise an ineffective assistance argument on direct appeal.  The trial judge denied the motion on the merits.  Olszewski through counsel later filed a motion to amend his motion for a new trial.  This motion to amend included a claim, raised for the first time, that his trial counsel was ineffective for failing to inform the court

---

[4]    The jury instruction stated, "If the jury believes that the police destroyed, concealed, condoned or participated in the destruction or concealment of any statement of any witness, the jury may infer that the destroyed or concealed statement contained something unfavorable to the Commonwealth's case."

about the reason for not calling Olszewski's father as a witness (on the theory that the court would then have refused to allow the prosecution to rely on the father's failure to testify). The court denied the motion to amend on the ground that the defendant had waived the issue by failing to present it in his motion for a new trial. A single justice of the Supreme Judicial Court denied Olszewski's petition for leave to appeal because his claim was "not new."

On December 5, 2001, Olszewski filed this petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts. Olszewski raised the three arguments that he raised on direct appeal and included the ineffective assistance claim that he raised in his motion to amend.

On January 18, 2005, the magistrate judge issued a detailed report recommending that Olszewski's petition be rejected. In her recommendation, the magistrate judge first addressed the destruction of Strong's original statement. Although the judge assumed that the police acted in bad faith in allowing Strong to destroy the statement, she ruled that the loss of evidence did not violate Olszewski's due process rights because, under California v. Trombetta, 467 U.S. 479, 485 (1984), Olszewski could recreate the substance of the document through cross-examining witnesses at trial.

The magistrate judge then addressed whether the prosecutor's statements during closing argument violated

Olszewski's due process rights. As to three of the allegedly improper statements, the magistrate judge found that the trial court's jury instruction cured any error. With respect to the remaining two statements (as to which there was no instruction), the magistrate judge also concluded that there was no constitutional error. The prosecutor's misstatement that two of Olszewski's alibi witnesses waited to testify until eight years after the murder, while erroneous, was a "fleeting reference in the midst of a detailed challenge to the veracity of these alibi witnesses' testimony" and "did not improperly taint the trial." As to the last allegedly improper comment, the magistrate judge found that the prosecutor did not act improperly in asking the jury to infer that the failure of Olszewski's father to testify meant that his testimony would have been adverse to Olszewski.

Next, the magistrate judge found that Olszewski's ineffective assistance of counsel claim was procedurally defaulted because it was clear that neither the trial court nor the single justice of the Supreme Judicial Court reached the merits of the claim. Finally, the magistrate judge found that the trial court's ex parte communications with and the dismissal of a juror were not improper because the juror was replaced with an alternate that Olszewski's counsel had selected and any possible error was harmless.

On March 30, 2005, the district court issued an order adopting the magistrate judge's findings and denying Olszewski's

petition without holding an evidentiary hearing. This appeal followed. This court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.

Where the district court does not hold an evidentiary hearing, we review the district court's denial of habeas corpus relief without deference. Evicci v. Maloney, 387 F.3d 37, 39-40 (1st Cir. 2004); Correia v. Hall, 364 F.3d 385, 387-88 (1st Cir. 2004).

This court's review of petitioner's claims is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19 (1996). Under AEDPA, we may only grant the petition if the Supreme Judicial Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 104(3)(d). Here, we conclude that there is no right to habeas relief. With respect to most of the claims, petitioner's constitutional rights were not violated; in the case of petitioner's ineffective assistance of counsel claim, we find that his claim was procedurally defaulted.

## III.

Olszewski first contends that his constitutional due

process rights were violated when the Commonwealth failed to preserve Strong's first statement.

**A.**

It is undisputed that Strong's first statement corroborated Olszewski's alibi and that Strong destroyed the only existing copy of his first statement. Strong testified that he gave the first statement on January 31, 1982, in the presence of Detective Edward Sypek and one or two officers whose names Strong could not recall.[5] At both the evidentiary hearing and at Olszewski's second trial, Strong testified that his first statement recited that, between 7 and 9 P.M. on January 28, 1982, Strong and Olszewski were talking in the Y.M.C.A. parking lot.[6] At trial, Detective Sypek confirmed that the statement "sa[id] I [Strong] was with Tony [Olszewski] from seven to nine."

---

[5] The trial court found that Strong told the police and wrote in his first statement that:

> on January 28[, 1982] he had been driving around in his own car at about 7:00 P.M. when he saw the defendant in his car, parked by the old Y.M.C.A. on Upper Church Street. He said he pulled his car alongside the defendant's car, that the two talked for about an hour and a half, and that Joanne Welch was not mentioned at all in the course of the conversation. He said the defendant left shortly before 9:00 P.M. and that he did not see him for the rest of the evening.

The Supreme Judicial Court adopted these factual findings.

[6] On cross-examination, Strong admitted that his first statement might have said that he was with Olszewski between 7:30 and 8:30 P.M., but his "memory [was] that it was sometime between seven and nine."

-11-

At trial, Strong testified that when he returned to the police station on February 15, 1982, Officer Sypek yelled at him and accused him of lying in his first statement. Strong then confessed that his first statement was false. After he admitted that the statement was false, the police violated their established procedures by failing to photocopy the first statement and leaving Strong alone in an interview room for some period of time with the only existing copy of the statement. Strong ripped up his first statement and threw the pieces in the trash can while he was alone in the interview room. The police did not immediately attempt to retrieve the pieces from the trash. Although Officer Sypek later looked for the pieces, the trash had already been emptied by the cleaning service.

Strong gave his second statement on the same day that he destroyed his first statement. In the second statement, Strong said that he was not with Olszewski on January 28, but instead encountered him on January 29, at which time Olszewski "told me that he had killed Joanne Welch," and stated that "he wanted to go up and dispose of the body." They got into Strong's car, and Strong drove toward the location where Welch's body was found.

On February 16, 1982, Strong gave the police a supplemental statement detailing his activities on January 28, 1982. He stated that he was having dinner with his fiancee at a steakhouse in Holyoke between 7:40 P.M. and 9 P.M. on January 28.

At trial, Strong was a key prosecution witness. He

testified to the substance of the second statement and elaborated further:

> [Olszewski] said that Joanne had stopped over his house and they had an argument about her new boyfriend there, and Joanne had asked [Olszewski] for h[er] money and she said that if he didn't give her her money back, that she would tell the cops about the robberies at the Westfield Mobil station. And then [Olszewski] said that they got into the car and drove over to Bear Hole. He got in Bear Hole and started to strangle her . . . and he wrapped a belt around her neck, dragged her out of the car, threw the belt away, stomped on her neck with his heel of his shoe, then ran her over with the car several times. One of the times she got stuck underneath the car. He got out, pulled her out underneath the car, put her in the car, and then drove her up there to Shaker Road where he threw the body off, and then parked the car at the bowling alley.

As they approached the location of Welch's body, "in front of us was a state trooper's car and some yellow tape . . . and [Olszewski] said that's where he had dumped the body, turn around." Strong turned the car around and drove to a Westfield bowling alley, where Olszewski "pointed out where he had parked Joanne's car." Strong testified that he drove Olszewski back into West Springfield and eventually dropped him off.

**B.**

"It is axiomatic that [Brady v. Maryland, 373 U.S. 83 (1963)] and its progeny established that a defendant has a due process right to request and receive evidence that the government possesses which is material to his guilt or punishment." United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993). To address the

-13-

problem of the loss or destruction of evidence by the prosecution, "the Supreme Court has developed a framework to analyze 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" Id. (quoting California v. Trombetta, 467 U.S. 479, 485 (1984) and Arizona v. Youngblood, 488 U.S. 51, 55 (1988)). The Supreme Court's decisions in Trombetta and Youngblood govern the constitutionality of the nondisclosure of evidence in "cases in which the government no longer possesses the disputed evidence." Id.

In Trombetta, defendants were charged with drunk driving and objected to the state's admission of breath-analysis tests. 467 U.S. at 483. They complained that the police had destroyed the original breath samples and that as a consequence they could not conduct their own tests. Id. The Supreme Court rejected the defendants' due process claim. Id. at 489. As a threshold matter, the Court noted that the police "were acting 'in good faith and in accord with their normal practice'" when they disposed of the breath samples. Id. at 488 (citing Killian v. United States, 368 U.S. 231, 242 (1961)). The Court then held that "more importantly," the missing evidence did not "meet [the] standard of constitutional materiality." Id. at 488-89. To satisfy this standard, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. The Court held

-14-

that neither condition was met. Id. First, the samples were not apparently exculpatory because "the chances [were] extremely low that preserved samples would have been exculpatory." Id. The second condition was not met because the defendants had "alternative means of demonstrating their innocence," e.g. inspecting the calibration of the breathalyzer machine or cross-examining the officer who administered the test. Id. at 490.

Four years later, in Arizona v. Youngblood, the Supreme Court considered the police's failure to preserve blood and semen samples taken from a rape victim. A police criminologist had conducted an initial review of the samples, but the state failed to preserve the samples by refrigeration so that the defendant could conduct his own tests. 488 U.S. at 53-54. The Youngblood Court found that the evidence was not apparently exculpatory, even though it had potentially greater value than the breath samples in Trombetta, because "[t]he possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in Trombetta." Id. at 56 n.*. In explaining Trombetta's "apparently exculpatory" requirement, the Court emphasized that it must be apparent that the evidence is exculpatory *before* it is lost or destroyed. Id. at 56. The Court then set forth a new standard for lost evidence that is only "potentially useful." Id. at 58. The Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute

-15-

a denial of due process of law." Id. at 58. In contrast, the Court recognized that a bad faith showing is not required when the evidence is apparently exculpatory: "[t]he Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." Id. at 57. The defendant did not establish a due process violation under the facts of Youngblood because the evidence was only "potentially useful" and the actions of the police could "at worst be described as negligent." Id. at 58.

The issue again arose in Illinois v. Fisher, 540 U.S. 544, 549 (2004), where the Court reviewed Youngblood and Trombetta. In Fisher, the defendant, who was charged with possession of cocaine, filed a discovery motion requesting all physical evidence, including the cocaine, that the state intended to use at trial. Id. at 545. Before the cocaine was provided to the defendant, the defendant "jumped bond" becoming a fugitive. Id. When he was captured ten years later, the state reinstated the possession charges but had, in good faith, already destroyed the cocaine. Id. at 546. The Court reiterated that "the applicability of the bad-faith requirement in Youngblood depended ... on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence." Id. at 549. Bad faith was not necessary if the evidence was "materially exculpatory." Such a showing was only necessary if the evidence was "potentially useful." The Court

-16-

concluded that the cocaine was only "potentially useful evidence" and that there was no due process violation under Youngblood because the defendant did not allege that the police acted in bad faith.  Id. at 547-48.

A variety of other circuits have considered the relationship between Trombetta and Youngblood and have concluded that (1) the destruction of "apparently exculpatory" evidence does not require a showing of bad faith but that (2) if the evidence is only "potentially useful," a bad-faith showing is required.[7]  Each of this court's past decisions in this area has involved potentially useful evidence, rather than apparently exculpatory evidence,[8] and in these cases, the court has held that a showing of

_____

[7]    See United States v. Moore, 452 F.3d 382, 388 (5th Cir. 2006)("impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government"); United States v. Estrada, 453 F.3d 1208, 1212-13 (9th Cir. 2006) (only requiring a showing of bad faith when the evidence is "potentially exculpatory, as opposed to apparently exculpatory"); Bullock v. Carver 297 F.3d 1036, 1056 (10th Cir. 2002) ("A defendant can obtain relief under the Due Process Clause when he can show that a police department destroyed evidence with 'an exculpatory value that was apparent before [it] was destroyed.' ... Where, however, the police only failed to preserve 'potentially useful' evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith by destroying the evidence.") (internal citations omitted); United States v. Wright, 260 F.3d 568, 571 (6th Cir. 2001) ("The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith.").

[8]    See United States v. Garza,435 F.3d 73, 75 (1st Cir. 2006)(noting that drugs and tape recordings of drug transactions are only "potentially exculpatory"); DiBenedetto v. Hall, 272 F.3d 1, 13 (1st Cir. 2001) (finding that blood stains on a sneaker were not "clearly exculpatory"); Femia, 9 F.3d at 995 (finding that the

-17-

bad faith is required.[9]  In contrast, this case involves apparently exculpatory evidence, rather than merely potentially useful evidence.  We need not decide whether, as the Supreme Court has suggested and other circuits have held, a showing of bad faith is unnecessary in these circumstances, although we note that the state agrees that such a showing is not required because Strong's first statement was apparently exculpatory.  Nor need we decide whether bad faith was demonstrated on the facts of this case, as the district court assumed.  We proceed instead to the question of whether the destroyed evidence satisfies <u>Trombetta</u>'s requirement that it be "to some extent irreplaceable."  <u>Femia</u>, 9 F.3d at 994.

The requirement that the evidence be irreplaceable was directly addressed by the Supreme Court in <u>Trombetta</u> in connection with the second prong of the materiality requirement.  The Supreme Court considered whether the defendants "were without alternate means of demonstrating their innocence."  <u>Trombetta</u>, 467 U.S. at 490.  In that case, the Court concluded that sufficient

---

parts of audio tapes capturing conversations between the defendant and other alleged co-conspirators "can only be characterized as potentially exculpatory evidence").

[9]    See <u>Garza</u>, 435 F.3d at 75 ("where lost or destroyed evidence is deemed to be only potentially exculpatory, as opposed to apparently exculpatory, the defendant must show that the evidence was destroyed in bad faith"); <u>Femia</u>, 9 F.3d at 994 ("we find no due process violation with respect to evidence that no longer exists because it was not destroyed in bad faith"); <u>cf.</u> <u>DiBenedetto</u>, 272 F.3d at 12 ("We need not decide whether this meets the 'bad faith' standard, because a closer look at the Supreme Court decision in <u>Trombetta</u> indicates that DiBenedetto's due process claims falls short in other regards.").

-18-

alternatives existed, including (1) inspecting the breathalyzer machine, (2) raising an argument that radio waves or the diet of the defendant influenced the results, or (3) cross-examining the officer who administered the test.  Id.  The irreplaceability requirement was also recognized by this court in DiBenedetto, which held that the loss of a blood spot on a sneaker was not irreplaceable.  272 F.3d at 13.  In DiBenedetto, we compared the blood spot to the breath samples in Trombetta: "in this case, the evidence to be presented was not the spot itself, but rather the test results, which the defendant was free to impeach by questioning the expert about the test methodology, the inconsistent results, and, most importantly, about the test's inability to conclude the spot was even human blood."  Id.

The defendant argues that Trombetta's irreplaceability requirement has been eliminated by Youngblood. We disagree. There is nothing in Youngblood to suggest elimination of the irreplaceability requirement.  Also, while neither the Supreme Court nor this court has directly addressed the irreplaceability requirement in the context of apparently exculpatory evidence (as opposed to potentially exculpatory evidence), we conclude that proof of irreplaceability is required in both apparent and potential exculpatory evidence cases.  In all cases under Brady, the defendant must demonstrate that the evidence was material to establish a constitutional violation whether the prosecution acted in good fath or bad faith.  See Brady v. Maryland, 373 U.S. 83, 87

(1963); <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434-35 (1995); <u>United States</u> v. <u>Hansen</u>, 434 F.3d 92, 102 (1st Cir. 2006). Irreplaceability is part of the materiality requirement in destroyed evidence cases, and it follows that the defendant in such a case bears the burden of showing that the evidence was irreplaceable. <u>See</u> <u>Trombetta</u>, 467 U.S. at 489; <u>Femia</u>, 9 F.3d at 993. Olszewski has not met that burden.

The question of whether evidence is "to some extent irreplaceable" is a legal question based on underlying facts. <u>See</u> <u>Trombetta</u>, 467 U.S. at 489. Here, the underlying facts are not in dispute, so we must determine whether, in light of those undisputed facts, the irreplaceability requirement has been satisfied. We conclude that the destroyed evidence was not irreplaceable. There has been no showing that Olszewski was unable to recreate the substance of Strong's original statement through testimony.[10] Strong's first statement was short, roughly one paragraph (and less than one page). There were no internal conflicts in Strong's testimony about the content of the statement, and Strong's testimony about the statement did not conflict with Sypek's testimony about the statement.

---

[10] This case is unlike <u>United States</u> v. <u>Cooper</u>, 983 F.2d 928 (9th Cir. 1993), where the police destroyed laboratory equipment allegedly used to manufacture methamphetamine. The Ninth Circuit held that "[general] testimony about the possible nature of the destroyed equipment would be an inadequate substitute." <u>Id.</u> at 932. In that case, no witness was directly familiar with the destroyed evidence and there was no other record of the evidence, e.g. photographs or laboratory tests.

Perhaps most importantly, Olszewski did not show that there was material information in the first statement that Strong and Sypek could not recall. Even though Strong appears to have memory lapses as to surrounding events and could not remember the statement "word for word," he testified that he "mostly" remembered what was in his first statement. Likewise, although Officer Sypek agreed on cross-examination that there might be "other things" in the statement that he could not remember, he remembered "the substance of the statement." Thus, at best the testimony established that the witnesses could not recall details in the first statement unrelated to its substance.

In short, although the loss of exculpatory information as a result of the destruction of Strong's first statement could result in a due process violation,[11] Olszewski has failed to show that the statement contained additional, material information that was lost as a result of the destruction. Mere speculation about the possible existence of additional, material evidence in the destroyed statement is simply insufficient to demonstrate a due process violation.

---

[11] At oral argument, we asked the assistant attorney general to "assume that Strong recalled that he had listed the identity of another witness in the statement who was with them during the supposed alibi period and he could not remember the name of the person and the police could not remember the name. Would we have a due process violation under those circumstances, assuming bad faith?" In response, the assistant attorney general conceded that "if there were such a piece of evidence in that statement that nobody could recall but everyone knew there was a name in there, you would have a due process violation."

Olszewski also argues that his statement was irreplaceable because cross-examining Strong and the police about the statement was not sufficient because it "forced Olszewski to try to prove his case through impeachment of a damaging, hostile witness." Trombetta itself involved the need to recreate the evidence through hostile witnesses, but there is no suggestion that this is insufficient.

Because Olszewski has not shown that he was "unable to obtain comparable evidence by other reasonably available means," we conclude that the destruction of Strong's statement was not a violation of due process under the Supreme Court's decisions in Trombetta, Youngblood, and Fisher.

**IV.**

Olszewski next argues that the prosecution made a number of prejudicial statements in closing argument that violated Olszewski's due process rights. For this kind of due process challenge to succeed, "it is not enough that prosecutors' remarks were undesirable or even universally condemned . . . ." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Rather, as the Supreme Court has made clear, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). In assessing whether the prosecutor's "improper statements during closing argument require[s] a new

-22-

trial, we examine (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case." United States v. Lowe, 145 F.3d 45, 50 (1st Cir. 1998)

Two of the prosecutor's statements involved misdescriptions of the evidence, and the court gave a curative jury instruction urging the jury to disregard the statements.[12]  This

[12]  Olszewski argues that the prosecutor improperly stated that Olszewski demonstrated a lack of remorse because Olszewski did not have contact with the Welch family "[e]ven after [Joanne's] body was found."  Defense counsel objected, explaining that Olszewski attended Welch's wake, and the judge immediately instructed the jury:

> there was a mention made with regard to any contact between the defendant and the Welch family.  If that should possibly be interpreted as a suggestion that the defendant did not attend the wake of the deceased, that should be ignored completely.  There was no evidence one way or the other on that point, but no inference should be drawn that that was true if any suggestion to that effect was made.

Olszewski also contends that he was prejudiced by the prosecution's closing-argument reference to a witness's opinion that Olszewski was guilty. Defense counsel objected, arguing that the statement had previously been excluded.  The trial judge immediately instructed the jury:  "[i]f there was . . . any argument with regard to any of the witnesses expressing an opinion as to the guilt or innocence of the defendant, I ask you to ignore that also."  In the jury charge, the judge further instructed: "There was in the course of the trial certain evidence which I ordered stricken. . . .  You must not consider any evidence which has been stricken. Please do everything in your power to put that completely out of your mind.  Once it is stricken, it should play

court has consistently held that where the prosecutor unintentionally misstates the evidence during closing argument, a jury instruction ordinarily is "sufficient to cure any potential prejudice,"[13] particularly where, as here, the instruction was given immediately after the statement. There is no suggestion here that the prosecutor deliberately misstated the evidence. We find that these instructions were sufficient to cure any error by the prosecutor.

Olszewski also complains that the prosecutor personally vouched for Olszewski's guilt. The prosecutor stated: "ladies and gentlemen, there is no fear in my voice when I say to you that either Phil Strong killed this girl or the defendant killed her. Absolutely none." He then suggested that because Strong had no motive or opportunity, the killer had to be Olszewski. Defense counsel objected, and the trial judge gave an immediate limiting instruction: "It is important to remember that anything that counsel says in closing argument is not evidence. I think I made that point before and I want to re-emphasize it." The judge also gave an instruction in the jury charge itself: "[Y]ou must make

no part in your deliberations."

[13] United States v. Bey, 188 F.3d 1, 9 (1st Cir. 1999); see also United States v. Ortiz, 447 F.3d 28, 35-36 (1st Cir. 2006) (holding that where the prosecutor inadvertently misstated the evidence any prejudice was cured by the trial judge's jury instruction); Lowe, 145 F.3d at 50 ("The court [through a curative instruction] properly accounted for any possible prejudice from the government's remark.").

your determination of the facts on the basis of the evidence which has been presented in the course of the trial. . . . The evidence does not include anything that either counsel may have said at any time in the course of the trial."

This court has stated that "the representative of the government approaches the jury with . . . tremendous credibility but that personal credibility is one weapon he must not use." United States v. Gonzalez Vargas, 558 F.2d 631, 633 (1st Cir. 1977). This case is distinguishable from cases such as Gonzalez Vargas where the prosecutor's argument was held to deny due process. Id. In Gonzalez Vargas, the prosecutor told the jury what he "personally believe[d]" on four separate occasions, and the court failed to give any curative jury instruction. Id. at 632-33. Here, while the prosecutor may have erred in stating his personal opinion to the jury, the statement was brief and the trial court's instructions to the jury sufficiently corrected for any potential prejudice.[14]

In two other instances there was no curative instruction. Olszewski contends that the prosecutor improperly questioned the credibility of two witnesses, Lori Garvey and Michelle Herrieux-Bernier, who gave statements that they saw Joanne Welch between 7

---

[14] The Supreme Judicial Court noted, "[A] single unfortunate and unartful isolated instance of the use of the first-person pronoun ... in the course of a legitimate argument as to the inferences the jury should draw from the evidence does not constitute error." Commonwealth v. Olszewski, 416 Mass. at 726, 625 N.E.2d at 541-42 (internal citations omitted).

-25-

and 9 P.M. on January 28, 1982, by arguing that "it didn't happen [until] eight years later that this information [came] forward." In fact, at least one of these witnesses testified at Olszewski's first trial. There was no curative instruction because Olszewski did not object to this statement at trial. We are not persuaded that this fleeting comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181.

In the other instance, Olszewski argues that the prosecutor improperly urged the jury to infer, from the fact that Olszewski's father did not testify at the trial, that the father's testimony would have been adverse to Olszewski. There was no curative instruction. Indeed, the trial court approved the argument in advance and instructed the jurors that they could infer that the witness "would have given testimony unfavorable to" Olszewski if the jurors found that the witness was available, was "friendly to or at least not hostilely disposed toward" the defendant, and could "be expected to give testimony of distinct importance to the case."

The surrounding facts are as follows: At Olszewski's first trial, his father testified that, around 6:30 P.M. on January 28, 1982, he picked his son up on Hillcrest Avenue in West Springfield and brought him home. Olszewski's father did not testify at the second trial. According to Strong's testimony at the second trial, Olszewski informed Strong that Olszewski's father

had picked him up in Westfield (where the body was found) after the murder (later than 6:30 P.M.).  In closing, the prosecutor argued: "ladies and gentlemen, his father has been here for two weeks sitting here watching this case.  You can infer by the fact that he didn't get up and tell you that he didn't pick up his son, you can infer from that . . . that he did pick up his son in Westfield," in accordance with Strong's version of events.

A jury may draw an adverse inference from a witness's failure to testify if "the evidence shows that the witness is available to testify on behalf of the party, that the testimony of the witness would be relevant and noncumulative, and that the witness is not prejudiced against the nonproducing party." United States v. Ariza-Ibarra, 651 F.2d 2, 16 (1st Cir. 1981).  We find that this standard is met here where Olszewski's father was present at the trial, his testimony was relevant, and he was not apparently prejudiced against Olszewski.  However, the defendant argues that the statement was constitutionally improper because the prosecution misrepresented the likely testimony of the witness.

We agree that under the decisions of the Supreme Court a due process violation may occur when the prosecution mischaracterizes the earlier sworn testimony of a witness.  Miller v. Pate, 386 U.S. 1, 7 (1967).  That is not what happened here. The prosecutor in closing did not misstate the father's testimony at the first trial.  The prosecutor was not required to assume that, if the father were to testify again, his testimony would be

favorable to Olszewski given the possibility that Olszewski's father could change his testimony were he to testify a second time. Under these circumstances, we fail to see how the prosecutor's "missing witness" argument violated Olszewski's due process rights.

Finally, we conclude that any prejudice caused by the prosecutor's closing argument was far outweighed by the strength of the government's evidence against Olszewski. See United States v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993) (considering "the strength of the evidence against the defendant"). Strong's testimony recounted Olszewski's confession in detail, contained facts that would only have been known to someone involved in the murder, and was consistent with Welch's extensive injuries. The prosecution also presented evidence that Olszewski had a motive to kill Welch, that he threatened to kill Welch, and that Welch intended to meet with Olszewski on the night of the murder.

Accordingly, we conclude that the prosecutor's statements in closing argument, whether considered individually or cumulatively, did not constitute a due process violation.

**V.**

Olszewski argues that he suffered ineffective assistance of counsel when his trial counsel failed to explain to the court that she did not call Olszewski's father as a witness because of her concern that the father's hostility toward the prosecution might damage the jury's perception of Olszewski. If the court had received this information, Olszewski contends, it would have

prohibited the prosecution from arguing in closing that Olszewski's failure to call his father was grounds to infer that the father's testimony would have been adverse to Olszewski. The district court concluded that Olszewski's ineffective assistance claim was defaulted in the course of the state court proceedings and thus was not available for relief on habeas. We agree.

We are precluded from reviewing state court decisions on habeas review if the decision rests on "independent and adequate state ground[s]." Simpson v. Matesanz, 175 F.3d 200, 205-06 (1st Cir. 1999) (citing Trest v. Cain, 522 U.S. 87, 118 S.Ct. 478, 480 (1997)). "[I]ndependent and adequate state grounds exist where 'the state court declined to hear [the federal claims] because the [defendant] failed to meet a state procedural requirement.'" Id. (quoting Brewer v. Marshall, 119 F.3d 993, 999 (1st Cir. 1997)). Under Massachusetts law, after a defendant's direct appeal is completed, the Supreme Judicial Court cannot review appeals from the denial of collateral attacks on a defendant's conviction unless a single justice finds the claims to be "new and substantial." Id. (citing Mass. Gen. Laws ch. 278, § 33E). This court has held that "[w]here there has been procedural waiver below, the denial of review under § 33E [because the claim is not new and substantial] is an independent and adequate state ground that bars federal habeas review." Id.

The default here concerns the new trial proceedings in

the Massachusetts state court, proceedings that were somewhat complex. After Olszewski's second trial, but before his direct appeal, Olszewski's trial counsel filed a motion for a new trial, which the trial judge denied on the merits. This motion did not raise an ineffective assistance of counsel claim. Olszewski's conviction was affirmed on direct appeal. The direct appeal also did not raise an ineffectiveness claim.

After his direct appeal, Olszewski filed a pro se motion for a new trial, arguing that (1) his trial counsel was ineffective for not calling Olszewski's father as a witness (we refer to this ineffectiveness claim as "the failure to call claim") and (2) appellate counsel was ineffective for failing to raise the failure to call claim on direct appeal. The trial judge denied the pro se motion. Olszewski then filed a motion for appointment of counsel, which a single Supreme Judicial Court justice granted. After counsel was appointed, but still acting pro se, Olszewski filed a motion to amend his motion for a new trial. His pro se motion to amend again raised the failure to call claim. Three months later, Olszewski, now through counsel, filed a second motion to amend, arguing for the first time that his trial counsel was ineffective for failing to inform the court of the reason for not calling Olszewski's father to testify. We refer to this ineffectiveness claim as the "communication claim." The trial court rejected both ineffectiveness claims. The trial judge held that the failure to

-30-

call claim was "already raised in the ... new trial motion [filed pro se after the direct appeal], which was argued, considered and denied." The trial judge rejected the communication claim because it should have been raised in the second new trial motion and was not new.

On a petition for leave to appeal, the issues were addressed by a single justice of the Supreme Judicial Court who ruled that the claims were "not new." We understand the single justice's ruling that the claims were "not new" to rest on two separate grounds: first, as to the failure to call claim, the single justice concluded that the "missing witness" argument had been fully considered on the direct appeal; that counsel's ineffectiveness in failing to call the father as a witness could have been raised on direct appeal; and that there was no showing that appellate counsel had been ineffective in presenting the appeal. In this connection, the single justice stated:

> given (1) the full bench's thorough evaluation of the "missing witness" issue and its ruling, after plenary review, to affirm the conviction; and (2) the absence of any proof that counsel was constitutionally ineffective in presenting the appeal, I find the defendant's claim is not new.

Second, with respect to the communication claim, the single justice concluded that counsel in the second new trial motion had presented a closely related ineffectiveness argument (the failure to call claim), and that the communication claim was

-31-

not new because it could have been raised in the earlier new trial motion. The single justice stated, "The strategic decision to press one approach in a motion for a new trial rather than another does not make the claim new."

We think that the single justice's ground for finding the communication claim not new - that is, the failure to raise it in the new trial motion after the direct appeal - constitutes an independent and adequate state ground for the refusal to consider the communication claim, and is completely unrelated to the merits. The defendant's argument to the contrary rests on reading the single justice's first ground for denying relief as related to the communications claim. While the single justice's opinion is hardly a model of clarity, we do not read that opinion as disagreeing with the trial judge's reasons for rejecting the claim - which clearly were grounded in the failure to raise the communication claim in the new trial motion filed after the direct appeal. Rather, we read the single justice's opinion as agreeing with that decision. Moreover, we do not see how the single justice could have intended to tax counsel for failure to raise the ineffectiveness issue (concerning the failure to communicate with the trial judge) on direct appeal since the record on direct appeal would not have supported such an argument. Accordingly, we hold that the district court was correct to deny habeas review of the communication

claim.[15]

**VI**.

Finally, Olszewski argues that his Sixth Amendment rights were violated when the trial judge excused a sitting juror on the basis of <u>ex parte</u> communications. We reject this contention as well.

The jury for Olszewski's second trial was impaneled in Pittsfield (Berkshire County), to be sequestered in Springfield (Hampden County). During jury selection, a prospective juror asked to be excused on the ground that sequestration would cause personal hardship because his wife was ill and needed at-home care. The judge rejected the excuse and the juror was impaneled along with fifteen others. When the prospective juror returned home that evening, his wife became distraught that she would be left alone. That night, the juror's son telephoned the judge and stated that his mother could not be left alone. After contacting the juror's wife's physician for confirmation of her condition, the judge excused the juror from further service on grounds of hardship. The judge informed counsel for both parties of these events in court the next day. The excused juror was replaced by an alternate.

---

[15] Even when a petitioner's claims are procedurally barred, this court may review the claims if "the prisoner can demonstrate cause for the default and actual prejudice" or "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 750 (1991). Olszewski does not argue that either of these exceptions applies here.

The defendant here does not assert that the trial judge erred in excusing the juror, and it is well established that "[t]he decision to substitute an alternate juror is committed to the sound discretion of the trial court" and will not be overturned "absent a showing of bias or prejudice to the defendant."[16] United States v. Corsino, 812 F.2d 26, 33 (1st Cir. 1987) (internal citations omitted). Rather, the defendant contends that he had a Sixth Amendment right to be present when the trial judge communicated with the juror's son and doctor, and when the juror was excused.

"[T]he right to personal presence at all critical stages of the trial ... [is a] fundamental right[ ] of each criminal defendant." Rushen v. Spain, 464 U.S. 114, 117 (1983). This right must be balanced against "the necessity for preserving society's interest in the administration of criminal justice." Id. at 118. We see no basis for Olszewski's claim that the judge's action in excusing the juror violated his Sixth Amendment rights. Nor do we think that the judge's ex parte communications amounted to prejudicial error. Unrecorded ex parte communications between a trial judge and a juror are subject to harmless error review. Id. at 119-20. Error is harmless where "the jury's deliberations, as a whole, [are] not biased by the undisclosed communication." Id.

---

[16] In fact, the Supreme Judicial Court found that it is "obvious that the defendant would not have opposed excusing the juror" where defense counsel "did not move for a mistrial, or request empanelment of an additional juror or any other remedial measure." Olszewski, 416 Mass. at 722, 625 N.E.2d at 539.

at 121. Olszewski has not alleged that the jury was biased by the ex parte communications.

This case is like United States v. Evans, 352 F.3d 65 (2d Cir. 2003), where a juror suffered an asthma attack during trial. That evening, the trial judge telephoned the juror ex parte and was told that the attack was "more serious than usual" and that the juror's doctor instructed him to stay at home. Id. at 68. While on the telephone, the judge excused the juror. Id. The Second Circuit found that any error was harmless because the juror was excused "well before" the case was sent to the jury, the remaining jurors were "not adversely influenced," and the dismissal did not "produce a drastic shift in the jury's composition." Id. at 70.

The lack of prejudice in this case is particularly clear where there is no suggestion that the juror discussed the case with other jurors; he was dismissed before the trial began; and counsel was informed of the communications the next morning at which time there was no suggestion of actual or potential prejudice or any request for curative action by the trial court. Indeed, that the judge dismissed the juror before court reconvened in the morning helped to ensure that the remaining jurors would not be prejudiced by the dismissed juror's dissatisfaction. Accordingly, we conclude that the district court correctly denied habeas relief as to this claim.

## VII.

The decision of the district court is

<u>Affirmed.</u>