

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00356-CR

Angelica **NAVARRO-DEPAZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2018CR13056
Honorable Melisa C. Skinner, Judge Presiding

Opinion by:  Beth Watkins, Justice

Sitting:  Luz Elena D. Chapa, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: March 27, 2024

AFFIRMED

Appellant Angelica Navarro-DePaz appeals her solicitation of capital murder conviction, raising issues related to the trial court's dismissal of a juror, the State's jury argument, and the trial court's exclusion of a defense witness's testimony. We affirm.

### BACKGROUND

San Antonio Police Department Detective Brian White received a tip from a confidential informant, Katie Martinez, who said that Navarro-DePaz wanted Anayeli Mendoza Flores killed.

White enlisted Detective Gabriel DeLeon to work undercover on the case and gave DeLeon's phone number to Katie so she could give it to Navarro-DePaz. Navarro-DePaz contacted DeLeon.

On July 20, 2017, Katie, Navarro-DePaz, and DeLeon met at a restaurant. Navarro-DePaz entered DeLeon's car, which was equipped with concealed recording equipment. They spoke in Spanish. She was under the impression that they had a friend, "El Banado," in common. DeLeon told her that he was part of a cartel, that he had a group of associates who did jobs in Texas and Mexico, and that his associates would accept narcotics or cash as payment. According to DeLeon, Navarro-DePaz:

- showed him burns on her arms and explained that "it's from the girl" who, two years earlier, had kidnapped her at gunpoint, taken her to one of her own rent houses, poured gasoline around her, and started a fire; Navarro-DePaz represented to DeLeon that it was "a miracle that she got out";

- told him that "it's been some time since this incident happened" so she did not think "she's waiting for anything or expecting anything";

- said that she had worked with El Banado to come up with the offer of $1,700 for the job;

- announced that she had a second job for him in Hermosillo, Sonora, where she wanted another woman killed.

At the end of the meeting, Navarro-DePaz and Katie drove to "the girl's" house, with DeLeon following, so he could see where "the girl" lived. Afterwards, she texted DeLeon photos of "Ana Mendoza."

On August 15, 2017, Navarro-DePaz and DeLeon met again. In this surreptitiously recorded meeting, DeLeon explained that his associates were "worrying that they weren't going to get paid." Navarro-DePaz told him she was going to give him "half of the money" now and the other half later. DeLeon told her his associates had "already seen the girl" and "where she works." He explained his associates "don't want to kill her here in San Antonio because they don't want

the police on them," so they are going to kill her in Nuevo Laredo, Mexico. Navarro-DePaz told him she wanted photos as "the proof that she's been killed," and she then counted out $850 and gave it to DeLeon. Navarro-DePaz then told him about a third woman she wanted killed. She explained that the woman owed her $70,000, and if the woman were killed, the woman's daughter would pay her back from life insurance proceeds.

After Navarro-DePaz left, White ordered a marked patrol car to conduct a traffic stop on the truck she was riding in. She was taken to SAPD headquarters and arrested.

A grand jury indicted Navarro-DePaz on a charge of soliciting capital murder. At trial, the State presented, inter alia, videos and translated transcripts of the two meetings. The State's theory was that Navarro-DePaz wanted Mendoza killed over a $40,000 debt she owed for trafficking Mendoza from Mexico into the United States. The defense called Mendoza, who testified that she had never met Katie.

Navarro-DePaz testified in her own defense. Through argument, cross-examination, and her own testimony, she put forth a theory that:

- she did not bring Mendoza to the United States, and Mendoza did not owe her any money;

- Mendoza and Katie were part of a criminal organization that trafficked non-citizens to the United States and sold them into forced labor;

- Mendoza had trafficked her own brother, Brandon, who later became Navarro-DePaz's boyfriend, and profited from his forced labor;

- Navarro-DePaz found these laborers, including Brandon, working in one of her rent houses and released them from that labor prematurely, drawing the ire and retaliation of the organization;

- Katie, who had previously extorted and threatened to kill her, forced Navarro-DePaz to participate in the murder-for-hire plot;

- the murder-for-hire plot was a ruse that was never supposed to be carried out, and it was created by Katie and Mendoza so that Mendoza, could obtain a

special visa as a victim of a crime, giving her legal status in the United States; and

- she only participated in the ruse, which she had been told the police were in on, because members of the organization had threatened to kill her and her children.

Navarro-DePaz's husband testified that Katie and Mendoza came by his feed store twice—once just before the August 2015 fire and a second time in June 2017, shortly before the August 2017 arrest in this case. The second time, the women stated, "We have something prepared for Angelica, and she can't even imagine what's coming." Both times they were aggressive, not there to shop but to instead threaten him and Navarro-DePaz. Navarro-DePaz was not present either time.

To further counter Mendoza's testimony that she had never met Katie, the defense called Joanna Maldonado. After Maldonado represented that she would invoke the Fifth Amendment rather than answer the State's proposed cross-examination questions, the trial court accepted the invocation and instructed the jury to disregard the testimony that it had heard.

The jury rejected Navarro-DePaz's defense, convicted her of solicitation of capital murder, and assessed punishment at confinement in prison for 20 years. She now appeals.

**ANALYSIS**

***Denial of Right to Public Trial or Right to Counsel at Critical Stage***

Navarro-DePaz argues the trial court denied her constitutional and statutory rights to a public trial and to counsel at a critical stage by conducting an ex parte communication with a sick juror before dismissing the juror. To preserve such arguments for appellate review, a party must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired and obtain a ruling. TEX. R. APP. P. 33.1(a); *Peyronel v. State*, 465 S.W.3d 650, 652–53 (Tex. Crim. App. 2015) (right to public trial complaint subject to forfeiture); *Routier v. State*, 112 S.W.3d 554, 586 (Tex. Crim. App. 2003) (right to counsel and presence at critical stage

complaint subject to forfeiture). "[T]he objection must be made at the earliest possible opportunity," and "the point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). An appellate court will uphold a trial court's ruling on any legal theory applicable to the case but will reverse a trial court's ruling only on a legal theory litigated at trial. *See Spielbauer v. State*, 622 S.W.3d 314, 318–19 (Tex. Crim. App. 2021); *Alford v. State*, 400 S.W.3d 924, 928–29 (Tex. Crim. App. 2013).

Here, the record reflects that Juror Number 6 was present on the first day of trial. On the second day of trial and outside the presence of the jury, the trial court referenced the ex parte communication:

> We're back on the record in 2018CR13056. Yesterday we had contact with . . . Juror Number 6. She's indicated that she was not feeling well. As a matter of fact, it sounded rather serious what she said, and she was trying to get a hold of her doctor. [Juror Number 6] did call me later -- I sent the jury home, telling them to be back here at eight o'clock this morning. [Juror Number 6] called me at her doctor's office, put her doctor on the line with me to indicate that she had a serious infection, and that it might be possible for her to be back on Monday, based on the symptoms that she was exhibiting and that she relayed to me.
>
> I think at this point, in my estimation, she's disabled, and we are proceeding with 11.

Defense counsel stated, "Judge, will the Court note our objection for the record?" and "my objection [is] that 12 shots at a hung jury are now down to 11." The trial court responded, "I understand your objection, but the law allows me to make this decision."

The law the trial court alluded to is article 36.29 of the Texas Code of Criminal Procedure, which provides, "after the trial of any felony case begins and a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict[.]" TEX. CODE CRIM. PROC. ANN. art. 36.29(a). A disability for purposes of article 36.29 includes "any condition that inhibits the juror from fully and fairly performing the functions of a juror." *Griffin v. State*, 486 S.W.2d

948, 951 (Tex. Crim. App. 1972). "The determination as to whether a juror is disabled is within the discretion of the trial court, and absent an abuse of that discretion, no reversible error will be found." *Routier*, 112 S.W.3d at 588.

Here, it is "hardly clear from the record" that Navarro-DePaz's trial objection was anything more than a complaint about the trial court's abuse of discretion in determining Juror Number 6 was disabled. *See Peyronel*, 465 S.W.3d at 653–54. Her objection cannot be considered the functional equivalent of an objection that her rights to a public trial or to counsel at a critical stage were being violated. *Routier*, 112 S.W.3d at 586 (objection based on article 36.29 insufficient to preserve appellate complaint that unrecorded ex parte communication with potentially disabled juror violated constitutional rights to counsel and presence during critical stage of trial); *Peyronel*, 465 S.W.3d at 653–54 (objection based on how jurors would perceive exclusion of public from gallery not functional equivalent of complaint that exclusion violated constitutional right to public trial). Navarro-DePaz has therefore forfeited these complaints. TEX. R. APP. P. 33.1(a).

Even if the constitutional complaints were cognizable without a trial objection, *see Routier*, 112 S.W.3d at 587, the trial court did not violate Navarro-DePaz's rights to counsel or to be present at all critical stages of her trial by engaging in the unrecorded ex parte communication with Juror Number 6 about her illness. *See id*. "The trial court's learning that the juror was ill and could not continue was not a critical stage in the trial." *Id*.; *see also Olszewski v. Spencer*, 466 F.3d 47, 63–64 (1st Cir. 2006) (judge's act of dismissing juror to care for wife, after ex parte communications with juror's son and his wife's doctor, did not violate defendant's Sixth Amendment rights). The phone call's timing—well prior to deliberations—and substance—dealing only with nature of Juror Number 6's health concerns and her ability to continue to serve—did not implicate Navarro-DePaz's need for "aid in coping with legal problems or assistance in meeting [her] adversary." *See United States v. Ash*, 413 U.S. 300, 310–13 (1973) (setting out critical stage test as construed by

caselaw). Nor did the trial court violate Navarro-DePaz's right to a public trial through this conversation. The trial court disclosed the communication on the record in open court and Navarro-DePaz "was present when the trial court dismissed the juror, and she was able to make objections at that time." *Routier*, 112 S.W.3d at 587; *see Rushen v. Spain*, 464 U.S. 114, 119 (1983) ("When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties."). We therefore overrule Navarro-DePaz's first issue.

### *Prosecutor's Closing Argument*

Navarro-DePaz next argues the prosecutor's closing argument that she had taken an oath "to uphold justice and to always seek the truth" improperly injected her opinion about the credibility of the State's witnesses to the jury.

### *Applicable Law and Standard of Review*

"The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019) (internal quotation marks omitted). "It should not arouse the passion or prejudice of the jury by matters not properly before them." *Id*. (internal quotation marks omitted). "A prosecutor may not inject [her] personal opinion of a witness's credibility during closing argument." *Mosley v. State*, 666 S.W.3d 670, 674 (Tex. Crim. App. 2023). "[P]roper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement." *Milton*, 572 S.W.3d at 239. "[R]eliance upon these four areas of permissible argument was born out of the prohibition against introducing matters in argument that were not

presented as evidence." *Id*. "Generally, the bounds of proper closing argument are left to the sound

discretion of the trial court." *Id*. at 240.

*Application*

The record reflects that the prosecutor began her rebuttal closing argument with a reference

to her oath of office:

> STATE: The first day that I got hired as an assistant district attorney for Bexar County, I went up to administration and I swore an oath. I raised my right hand, just like all of you all did last week. And the oath that I took was to uphold justice and to always seek the truth.
>
> DEFENSE: I'm going to object, Judge. She can't argue that because she believes the case, they should believe the –
>
> COURT: I'm sorry? She can't argue?
>
> DEFENSE: She can't argue because she believes the case, they should believe it. That's not evidence. She has to proffer evidence that was presented in the trial, not what she believes herself.
>
> COURT: She hasn't said that, though.
>
> DEFENSE: That's what I mean.
>
> COURT: Well, that's overruled. Continue.
>
> STATE: Thank you, Your Honor. That oath is to uphold justice and to always seek the truth in every single case. That's exactly what we're doing here today.

We find Navarro-DePaz's objection specific enough to preserve her appellate argument that the

prosecutor improperly injected her opinion about the credibility of the State's witnesses. TEX. R.

APP. P. 33.1(a)(1)(A). This issue is often litigated, and courts typically conclude that a prosecutor

alludes to her own oath of office to bolster the State's case—to imply the prosecutor's case is

credible and worthy. Similar arguments have been held to be reversible error, but only where the

prosecutor simultaneously argues defense counsel did not take a similar oath or accuses defense

counsel of bad faith or insincerity. *See Wilson v. State*, 938 S.W.2d 57, 59–62 (Tex. Crim. App.

1996) (collecting cases and noting that where State presented no evidence that prosecutor took oath, argument injected new fact into case), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352, 357 n.26 (Tex. Crim. App. 2002).

Here, the prosecutor made no such argument about defense counsel. Rather, as the State notes in its brief, the record shows the prosecutor "moved on from that point." *See Kibble v. State*, 340 S.W.3d 14, 22 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("The prosecutor in this case did not explicitly state that the defense attorney had not taken an oath."). Moreover, the trial court could have considered the prosecutor's reference to the oath an answer to Navarro-DePaz's closing argument that "the State is going to tell you that the defense has every right to subpoena witnesses, just like they do. Well, sure we do. And we did try to bring in some witnesses. You all saw how that went." *Milton*, 572 S.W.3d at 239; *see Hinojosa v. State*, 433 S.W.3d 742, 766 (Tex. App.—San Antonio 2014, pet. ref'd). Finally, even if reference to the oath were outside the record and improper bolstering, the argument was neither extreme nor manifestly improper. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Rather, it alluded to the law as set out in Article 2.01. TEX. CODE CRIM. PROC. ANN. art. 2.01 ("It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done."). We therefore overrule Navarro-DePaz's second issue.

### *Exclusion of Defense Witness Joanna Maldonado*

In her final issue, Navarro-DePaz argues the trial court abused its discretion in sua sponte raising the issue of defense witness Joanna Maldonado's possible non-citizen status in the United States, and then determining Maldonado had a legitimate fear of possible incrimination because of that non-citizen status. Navarro-DePaz contends the trial court's determination on this point violated her right to compulsory process of witnesses.

*Applicable Law and Standard of Review*

The Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The Compulsory Process Clause preserves the right of a defendant in a criminal trial to have a compulsory process for obtaining favorable witnesses. *Coleman v. State*, 966 S.W.2d 525, 527–28 (Tex. Crim. App. 1998) ("The Sixth Amendment right to compulsory process 'is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.'") (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)).

"In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). But the Compulsory Process Clause does not include the right to compel a witness to waive the Fifth Amendment right against self-incrimination. *Bridge v. State*, 726 S.W.2d 558, 567 (Tex. Crim. App. 1986). Rather, the defendant's right to present evidence must yield to the opposing Fifth Amendment privilege against self-incrimination if the witness has a legitimate fear of possible incrimination. *Walters v. State*, 359 S.W.3d 212, 215–16 (Tex. Crim. App. 2011); *see also Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (the privilege "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used").

We apply an abuse of discretion standard to review issues regarding limitations on the right to compulsory process, including a trial court's decision to allow a witness to invoke her Fifth Amendment privilege. *See Ortega v. State*, 472 S.W.3d 779, 791 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (limit on compulsory process); *Fuentes v. State*, 662 S.W.2d 19, 24 (Tex. App.—Houston [1st Dist.] 1983, pet. ref'd) (invocation of Fifth Amendment privilege); *see also United*

*States v. Lyons*, 703 F.2d 815, 818 (5th Cir. 1983) (trial court has duty to protect the Fifth Amendment rights of witnesses and "necessarily is accorded broad discretion in determining the merits of a claimed privilege and the measures to be taken as a result of a valid Fifth Amendment claim").

*Application*

Defense witness Joanna Maldonado testified on direct examination that she cleaned and renovated houses for Navarro-DePaz and worked at her bar. She also knew Mendoza because she had done work on the house that Navarro-DePaz let Mendoza live in. After defense counsel asked Maldonado a few more questions, the trial court called the attorneys to the bench and asked, "Is she here legally? . . . [Y]ou start asking questions like that, she's got to have an attorney."[1] Defense counsel told the trial court she was undocumented but also stated "it's not relevant to our case[.]" The trial court appointed Maldonado an attorney, who advised her to invoke her Fifth Amendment privilege to any question related to her status or manner of entering the country. After an in camera hearing, the trial court ruled that because Maldonado would not make herself available for full cross-examination by the State, she could not testify. The State pointed out, and the trial court agreed, that Navarro-DePaz made the non-citizen status issue relevant when she cross-examined detectives about Mendoza's claimed debt to Navarro-DePaz for bringing her to the United States. Citing *Keller v. State*, 662 S.W.2d 362 (Tex. Crim. App. 1984), the trial court said that it would strike the testimony she had given already:

---

[1] The trial court brought up the privilege sua sponte. The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. It "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar*, 406 U.S. at 444–45. A witness asserts the privilege by stating she has reasonable cause to apprehend danger of incrimination from a direct answer. Then, "[i]t is for the court to say whether his silence is justified." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Here, Maldonado did not first assert the privilege. Rather, the trial court preemptively raised the issue and assigned her an attorney. But it was not improper for the trial court to advise Mendoza of her Fifth Amendment privilege, and that it did so is not the same thing as invoking the privilege on her behalf. *See Lyons*, 703 F.2d at 818.

So she's already testified that she worked for Ms. DePaz. It is, in fact, not only a fair inquiry as to whether or not she has a bias to testify the way she's testifying for the defense on direct, it also would be necessary for the State, if they were to inquire as to her employment status with Ms. DePaz, to also, if they chose to, and they indicated that they would, inquire as to whether or not her status was legal.

It appears that the *Keller* case does support that witness[] testimony actually be struck, anything she's testified to at this point, since she intends to invoke her Fifth Amendment privilege upon cross-examination.

Defense counsel again argued that the issue was irrelevant:

I would proffer to the Court the subject matter I want to ask this witness about has to do with does she know Katie, how do they know each other, are they friends – not they, I'm talking about [Mendoza] and Katie – do they spend time together, do they go out together, did they spend time at her house together. Because as the Court knows, [Mendoza] denies ever meeting Katie or knowing who she is. She has personal knowledge from her own eyes about that relationship. None of that touches on issues of immigration, right.

The trial court responded that the proposed cross-examination—on whether Navarro-DePaz "even has a right to employ her because she's not legally here"—would "go directly to the bias in this case." And because it interpreted *Keller*'s analysis as being based on "fairness to both sides," the trial court concluded it would not allow Maldonado to testify and would "tell this jury to disregard the first part of her testimony." *See id*. at 365; *Chambers*, 410 U.S. at 302.

In *Keller*, the defendant had been charged with unauthorized use of an automobile. *Keller*, 662 S.W.2d at 363. During a hearing outside the jury's presence, a defense witness testified that he sold a car to Keller and gave him a title. *Id*. at 364. On cross-examination, the State asked the witness where he obtained the car, but the witness refused to answer on Fifth Amendment grounds. *Id*. The trial court allowed the witness to assert the Fifth Amendment privilege and refused to permit the witness to give any testimony before the jury. *Id*. The Texas Court of Criminal Appeals held the trial court did not abuse its discretion "in disallowing the defense witness' direct testimony when the witness refused to answer questions on cross-examination which were relevant to the subject matter of the inquiry or which related to the witness' direct testimony." *Id*. at 365. Rather

than being collateral, the question "where did you get the car" was "relevant to test the truthfulness of the witness' direct testimony that he sold the car to appellant and gave him a title." *Id*. "The answer solicited might have shown that the witness did not have either possession or title to the car, and thus could not have sold the car to appellant, or it might have shown that appellant had notice that the car was stolen." *Id*. The answer to the cross-examination question in *Keller* that led the defense witness to invoke the Fifth Amendment thus could have tied him directly to the crime for which the appellant in that case was on trial. *See id.* Such is not the case here.

Whether the trial court abused its discretion in refusing to allow Maldonado to testify turns on whether the status questions "were relevant to the subject matter of the inquiry or which related to the witness' direct testimony." *See id*. Navarro-DePaz argues they were not and points to *Smith v. State*, 681 S.W.2d 734 (Tex. App.—Houston [14th Dist.] 1984, pet. ref'd). There, Smith alleged that his rights of confrontation and cross-examination were denied when the trial court refused to allow him "to elicit testimony during cross-examination concerning the alien status of the complainant and two state's witnesses." *Id*. at 737. The appellate court held that "[t]he alien status of complainant and the two witnesses clearly has no relationship to the alleged crime." *Id*.

This case falls between *Keller* and *Smith*—the proposed cross-examination of the defense witness neither had a *direct* relationship to the crime being tried (as in *Keller*) nor *no* relationship to the crime being tried (as in *Smith*). Rather, this proposed cross-examination bore on the connection between the defendant and the defense witness; it had the potential to expose bias borne of a power imbalance. *See* TEX. R. EVID. 613(b)(1) ("When examining a witness about the witness's bias or interest, a party must first tell the witness the circumstances or statements that tend to show the witness's bias or interest."); *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004) (to show bias, as would be developed on cross-examination, proponent of evidence must show nexus or logical connection exists between witness's testimony and witness's potential

motive to testify in favor of the other party); *cf. Irby v. State*, 327 S.W.3d 138, 147–48 (Tex. Crim. App. 2010) ("[A] 'vulnerable relationship' based on a [prosecution] witness's pending charges or probationary status does not hover cloud-like in the air, ready to rain down as impeachment evidence upon any and all such witnesses. There must be some logical connection between that 'vulnerable relationship' and the witness's potential motive for testifying as he does."). Because the trial court acted within its discretion to find that: (1) the State made the logical connection here given the smuggling-and forced-labor accusations and evidence; (2) the proposed cross-examination questions would go to a non-collateral matter; and (3) Maldonado legitimately declined to answer the questions, we overrule Navarro-DePaz's third issue. *Keller*, 662 S.W.2d at 365.

## CONCLUSION

Having overruled Navarro-DePaz's appellate issues, we affirm the trial court's judgment.

Beth Watkins, Justice

DO NOT PUBLISH