# United States Court of Appeals
## For the First Circuit

No. 23-1504

UNITED STATES OF AMERICA,

Appellee,

v.

FRANCISCO XAVIER ORTIZ-COLÓN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Gelpí, Circuit Judges.

Linda Backiel for appellant.

Julia M. Meconiates, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, were on brief,
for appellee.

May 6, 2026

**THOMPSON**, **Circuit Judge**.  On November 9, 2022, a jury for the United States District Court of Puerto Rico concluded its deliberations, re-entered the courtroom where it had spent the last six days, and returned nineteen guilty verdicts against appellant-defendant Francisco Xavier Ortiz-Colón ("Ortiz").[1] Ortiz now appeals his convictions for producing, possessing, and receiving child pornography, and for coercing and enticing a minor, along with the substantive reasonableness of his 360-month sentence.

Ortiz claims the district court committed a plethora of plain errors throughout his trial as follows: while empaneling the jury, excusing jurors during trial, allowing overview testimony from government witnesses, responding to juror notes, and allowing multiple convictions based on the same alleged conduct.  And Ortiz claims that, after the jury returned its findings, the district court abused its discretion by not varying downward even more than it did when issuing his sentence.  After careful scrutiny of the trial record and due consideration of the arguments presented, we affirm in part and remand for further proceedings.

---

[1] Although Ortiz's appellate briefing spells his name "Ortíz," his district court filings and the rules of the Royal Academy of the Spanish Language (Real Academia de la Lengua Española) suggest Ortiz is correctly spelled without an accent.  Therefore, we proceed without the accent.

We begin with a brief rundown of the relevant facts as the jury might favorably have found them, supported by the appellate record.  See United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015); United States v. Bradshaw, 281 F.3d 278, 280 (1st Cir. 2002).[2]  As we present our exposition, we take a big-picture approach and leave more acute details for our forthcoming discussions of Ortiz's specific claims.

**A.**

In December 2019, a team from the Crimes Against Children Task Force (based within Homeland Security Investigations) launched an investigation after receiving a troubling complaint from a school social worker in San Juan, Puerto Rico.  The social worker reported that an Instagram user under the account "axilas_promocion"[3] had contacted a twelve-year-old student, KMC,[4] initially requesting photos of her underarms and, later, requesting sexually explicit photos.  Federal investigators interviewed KMC and learned that her classmate, SMG, received

---

[2] Because Ortiz challenges the substantive reasonableness of his sentence, we will pull our background facts for that later discussion from the undisputed portions of the presentence investigation report and the transcript of his sentencing hearing. See United States v. Brown, 26 F.4th 48, 53 n.1 (1st Cir. 2022).

[3] This account handle means "armpit promotion" in Spanish.

[4] Throughout this opinion, we use initials to protect the identities of the minor victims involved.

similar Instagram messages and provocative requests from the axilas_promocion account.

The following month, authorities obtained a search warrant for the axilas_promocion Instagram account that produced subscriber information, a list of internet protocol ("IP") addresses, photographs, videos, and messages associated with the account. These recovered materials included messages between the axilas_promocion user and KMC and SMG, along with sexually explicit photos of KMC. Investigators reviewed the list of IP addresses associated with the axilas_promocion account and ultimately flagged one as repeatedly being used to log in and upload media. Equipped with this IP address, authorities tracked it back to a physical address in San Juan.

While this investigation was underway, authorities received additional complaints matching the pattern of events experienced by KMC and SMG. This time an Instagram account called "axila_promociones"[5] had contacted eleven-year-old APR, fourteen-year-old ACM, and fourteen-year-old DAR. In each instance, the axilas_promociones user first solicited underarm photos from the minors before escalating to requests for sexually explicit images. Another round of search warrants ensued and produced a swath of records from Instagram including more

---

[5] This second Instagram account listed in its bio a third linked account, axila_promociones_promociones.

subscriber information, messages, photos, and videos associated with the second axilas account. Further inspection of these records revealed illicit messages with an additional four minor victims and sexually explicit photographs of those victims, along with one more.

On June 10, 2020, authorities executed a search warrant at the San Juan residence located through the axilas_promocion account's IP address. Through this search warrant, law enforcement agents were authorized to seize any electronic device on the premises that could have been used to access the axilas accounts. When they arrived, authorities found Ortiz on site and ultimately recovered several cell phones (including a black Samsung cell phone seized from Ortiz's person that he said he was the sole user of), a computer, and a tablet. A later review of Ortiz's Samsung cell phone revealed sexually explicit photos of six of the minor victims previously identified through the Instagram records. Other seized electronics furnished additional depictions of child pornography and further links between Ortiz and the axilas accounts -- including phone numbers verified by Instagram and email addresses used to register the accounts. Ortiz was arrested on August 19, 2020.

**B.**

Based on the above-mentioned conduct, Ortiz was charged with nine counts of production of child pornography (based on his

nine minor victims) in violation of 18 U.S.C. § 2251(a), eight counts of coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b), one count of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2), and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) -- amounting to nineteen counts in total. Ortiz opted to go to trial and, after six eventful days of evidence production and one day of deliberating, the jury found Ortiz guilty on all nineteen counts. Sentencing ensued thereafter, and the district court issued Ortiz a downwardly variant sentence of 360 months' (i.e., thirty years') imprisonment.

## II.

On appeal, Ortiz raises six claims of error. Four of these claims pertain to the trial proceedings below, specifically the empanelment of jurors, the excusing of empaneled jurors, the scope of the government's witness testimony, and the fielding of juror notes. Ortiz also argues that his convictions violate the Fifth Amendment's Double Jeopardy Clause by effectively punishing him twice for the same conduct. And Ortiz's final challenge claims the district court's sentence was substantively unreasonable.

Before unpacking each of Ortiz's appellate asseverations, we'll pause to articulate the standard of review guiding our discussions. As Ortiz concedes, our plain-error standard applies to most of his claims because he failed to lodge

the appropriate objections (and thus to preserve his arguments) during trial. See United States v. Casanova, 886 F.3d 55, 59 (1st Cir. 2018). Under this demanding standard, Ortiz "must show that (1) an error occurred, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Espinal-Almeida, 699 F.3d 588, 600 (1st Cir. 2012)). As we've explained time and again, appellants face an uphill charge in establishing these four criteria. See, e.g., United States v. Galíndez, 999 F.3d 60, 64-65 (1st Cir. 2021) (contextualizing the four prongs of plain error review).

With these criteria as our guideposts, we may proceed to Ortiz's first claim of plain error.

## A. Empaneling Jurors

Ortiz first argues that the district court failed to pose more specific questions to prospective jurors, questions that would have warned them about the disturbing nature of the offenses charged. As a result, Ortiz contends the court's voir dire[6] prevented him from intelligently using his peremptory juror

---

[6] "Voir dire" originates from the French phrase meaning "to speak the truth." It has been co-opted by the legal community to refer to the jury selection process, where telling the truth remains quintessential.

challenges and inadequately protected his right to a fair trial and an impartial jury.

To properly address Ortiz's arguments, we first need to provide a bit more info about what happened below. Before Ortiz's trial began, he submitted a list of proposed juror questions for voir dire. The district court received his list and proceeded to ask Ortiz's proposed questions practically verbatim. The court informed potential jurors that Ortiz had been charged with "sex offenses" and asked if anyone felt he was more likely to be guilty as a result. The court next asked whether anyone felt "that because of the nature of the case, it would be difficult for [them] to try to issue a verdict fairly and impartial[ly] without any prejudice or bias." Continuing, the court told the jury pool that they "may be shown nude images of what the [g]overment alleges constitutes child pornography" and that those images "may be unpleasant to view." Due to this potential evidence, the court asked whether seeing such images would prevent any jurors from being impartial.

Several potential jurors heeded the court's warning and, outside the earshot of the other potential jurors, expressed their personal concerns based on these questions.[7] The court probed each

---

[7] For instance, one juror confided to the court, "[f]rom six years old to fifteen, I was a sexual abuse victim and I don't think I can handle this." That juror was subsequently excused for cause.

concerned potential juror with more questions about their views of child pornography and if they had any history of sexual abuse. All the while, as prospective jurors approached and answered questions related to the nature of the offenses for voir dire, defense counsel for Ortiz was present and afforded the opportunity to ask follow-up questions. After court and counsel concluded all questioning, the court implored a final time whether the government or defense counsel had any further questions for voir dire. Both sides said no. Eventually eight jurors (six of whom expressed an inability to be fair and impartial) were excused for cause.

Ortiz now asserts that the district court's limited questioning and "bland euphemism[s]" constituted plain and obvious error.[8] We plainly disagree.

Trial courts have broad discretion in conducting voir dire "subject only to the essential demands of fairness." United States v. Delgado-Marrero, 744 F.3d 167, 201 (1st Cir. 2014) (quoting United States v. Misla-Aldarondo, 478 F.3d 52, 60 (1st Cir. 2007)). Accordingly, we do not ascribe a "hard-and-fast formula" to the district court's decisions regarding the "necessary depth or breadth of voir dire." Id. (quoting Skilling

---

[8] The government claims Ortiz failed to develop this argument (and practically all others) according to the four plain-error prongs, which would mean Ortiz has waived this claim on appeal. See United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016). We reject this casting of Ortiz's briefing and, unless stated otherwise, proceed to review his claims for plain error.

v. United States, 561 U.S. 358, 386 (2010)). Here, "the court asked a series of questions to identify potential biases and inquired as to whether prospective jurors could be fair and impartial in deciding the case." Id. Moreover, the court did not refuse to ask any questions requested by Ortiz, and it gave defense counsel ample opportunity to make further inquiries. Ortiz's counsel declined that invitation, and Ortiz has failed to present a specific error committed by the district court in conducting voir dire. See id.; see also Galíndez, 999 F.3d at 64-65 (explaining the need for appellant to show "an irrefutable error given binding precedent" under plain error review).

Before departing from this issue, we note that Ortiz says that the district court also erred by: (1) failing to inform prospective jurors that the government planned to call law enforcement agents as witnesses; and (2) failing to account for the "demographics" of the jury (specifically jurors' sex and their relationships to children) when considering their impartiality. Aside from a sparse summary of some events that occurred and some additional details about the empaneled jurors, Ortiz has presented these possible claims "unaccompanied by some effort at developed argumentation." United States v. Zannino, 895 F.2d 1, 17 (1st

Cir. 1990).  Accordingly, as is our settled appellate rule, these claims are waived.  Id.[9]

## B. Excusing Jurors

Ortiz next claims the district court erred by excusing three jurors prior to deliberations.  He concedes that no objections were raised before the trial court, and thus we continue to apply our plain error standard of review.  See Galíndez, 999 F.3d at 64-65.  The government disputes Ortiz's version of events and says that only two jurors departed during trial.  So, before we can address Ortiz's claim of error, we need to set the record straight.

On the second day of trial, proceedings abruptly stopped when one juror bolted from the courtroom.  This juror -- who was simultaneously labeled juror thirteen and alternate juror one -- eventually came back and explained that she made for the exit because she was "coughing a lot."  The court informed both parties that it was inclined to excuse juror thirteen, in part due to the availability of three more alternate jurors.  Both counsel

_____

[9] Even if Ortiz had not waived his law enforcement-related claim, his briefing incorrectly accuses the district court of not asking potential jurors whether they would tend to credit law enforcement witnesses simply by virtue of their employment.  The court asked that precise question, right after telling the jury pool that agents for the federal government were likely to testify. Furthermore, the court (while not saying so explicitly) asked the jury pool if anyone knew the law enforcement agents the government planned to call as witnesses and read their names on the record, contrary to Ortiz's appellate retelling.

- 11 -

for the government and for Ortiz assented to excusing the juror and continuing the trial. With everyone in agreement, the court thanked juror thirteen for her service and excused her from duty. That concludes the story of one excused juror.

Ortiz claims the court excused another alternate juror that day. This time, Ortiz points to a note from an unnamed juror ("juror note nine") and the court's written response "Alternate juror excused." The government has provided us with a certified translation of juror note nine in its briefing. The note reads: "May I go to the bathroom for a moment? I'm trying not to cough loudly." The trial minutes docketed after the second day of trial show us that the court received juror note nine and excused alternate juror one (a.k.a. juror thirteen whom we've already discussed) that day. Ortiz claims the unidentified author of juror note nine was not alternate juror one, but rather a different juror who the court excused off the record and without explanation.

Based on our reading of the record, the court excused only one alternate juror on the second day of trial. Unfortunately, the juror notes are not time-stamped. But the content of juror note nine and alternate juror one's reference to coughing, along with the court's record of only excusing one juror that day, alleviate any concern.

Ortiz's arguments to the contrary fail to prove a second alternate juror was ever excused. Ortiz speculates that the author

of juror note nine must have been someone other than alternate juror one because the contents of the note "reflect[ed] the instruction given only after [alternate juror one] was dismissed." Not so. On the first day of trial the court informed all jurors multiple times that they could send a note if an issue arose and merely repeated that instruction after alternate juror one's dismissal. Thus, the official count remains at one excused juror.

The record shows (and the parties agree) that the court excused another juror on the fifth day of trial. Right after calling the case, the court informed opposing counsel that former juror twelve had called the jury office in the night and had been excused "for a personal matter that ha[d] nothing to do with the case itself." The court stated that an alternate would be promoted to the jury, and neither party objected.

Therefore, the final tally comes to two excused jurors, and Ortiz incorrectly claims that the district court excused two jurors ex parte. The court excused only two jurors total, one of which (juror thirteen a.k.a. alternate juror one) was excused in the presence of counsel without objection. Ortiz's remaining claim is that the excusal of former juror twelve (who phoned in with a personal matter) outside the courtroom and not in the presence of

counsel violated Federal Rule of Criminal Procedure 43 and his Sixth Amendment rights.[10]

We have previously determined that the right to be present at all critical stages of a trial and a defendant's Sixth Amendment rights are not necessarily violated when a judge excuses a juror based on ex parte communications. See Olszewski v. Spencer, 466 F.3d 47, 64 (1st Cir. 2006). In that prior instance, a prospective juror initially asked to be excused because his wife was ill, and he needed to care for her. Id. The court did not excuse the juror, and he was empaneled. Id. That night, the juror's son called the judge and reiterated his father's request because his mother could not be left alone. Id. After contacting the wife's physician, the court excused the juror on grounds of hardship. Id. Counsel was informed of these events in court the next day, and an alternate juror replaced the excused juror. Id.

_____

[10] Federal Rule of Criminal Procedure 43 provides, in relevant part to Ortiz's claim, that a defendant must be present at "every trial stage." While Ortiz does not differentiate between the protections afforded by Rule 43 and the Sixth Amendment, we note the scope of Rule 43 may be broader in certain circumstances. See United States v. Ofray-Campos, 534 F.3d 1, 17 (1st Cir. 2008) (holding that "a judge's responding to a jury note outside the presence of counsel and defendant" violates Rule 43); see also United States v. Adekoya, No. 95-1123, 1996 WL 402049, at *3 n.6 (1st Cir. July 18, 1996) ("Defendant's right under Rule 43 to be present at trial proceedings is broader than the constitutional right alone."). Regardless, Ortiz's claim falls short under either standard as he has failed to demonstrate harm or prejudice. More on this point shortly.

Upon hearing these facts, we found "no basis for Olszewski's claim that the judge's action in excusing the juror violated his Sixth Amendment rights." Olszewski, 466 F.3d at 64. Nor did we find that the judge's ex parte communication amounted to prejudicial error. Id. at 64-65. And much like in Olszewski, the court here, in open court, informed counsel and the defendant of its communications with the excused juror the next morning, and when it did, counsel made no complaint of prejudice to Ortiz, nor was there a request for any curative action from the court. See id. at 64-65. Trial judges are in a better position than us to decide whether a juror can continue to fulfill their duties, and we decline Ortiz's invitation, in a situation like this one, to second-guess that decision. See United States v. Doherty, 867 F.2d 47, 71 (1st Cir. 1989) (citing United States v. Molinares Charris, 822 F.2d 1213, 1223 (1st Cir. 1987)). Therefore, Ortiz has failed to show the district court judge committed an obvious error. See Galíndez, 999 F.3d at 64-65.

To the extent Ortiz raises a challenge beyond the procedural nature of the district court's decision, that claim is rejected as Ortiz has not demonstrated that the ex parte communication prejudiced him or deprived him of a fair trial. "Unrecorded ex parte communications between a trial judge and a juror are subject to harmless error review." Olszewski, 466 F.3d at 64 (citing Rushen v. Spain, 464 U.S. 114, 119-120 (1983)); see

- 15 -

also <u>United States</u> v. <u>Adekoya</u>, No. 95-1123, 1996 WL 402049, at *4 (1st Cir. July 18, 1996) (rejecting defendant's argument under Rule 43 to be present during the sidebar questioning of prospective jurors because there was no harm or prejudice to defendant). An error in these circumstances is harmless where "the jury's deliberations, as a whole, are not biased by the undisclosed communication." <u>Olszewski</u>, 466 F.3d at 64 (citation modified). Jury deliberations had not begun, meaning that the excusal could not have influenced deliberations, and the judge's communication with the excused juror occurred beyond earshot of those who remained empaneled. <u>See</u> <u>Doherty</u>, 867 F.2d at 72. As such, we discern neither error nor prejudice to Ortiz.

## C. Overview Testimony

In the next segment of Ortiz's appeal, he claims that three of the government's witnesses provided impermissible "overview testimony." To Ortiz, these witnesses for the prosecution testified to matters beyond the scope of their expertise and advocated from the witness stand. We review these unpreserved evidentiary challenges for plain error and will affirm even in the presence of error if that error was harmless. <u>United States</u> v. <u>García-Sierra</u>, 994 F.3d 17, 26 (1st Cir. 2021); <u>United States</u> v. <u>Rosado-Perez</u>, 605 F.3d 48, 54 (1st Cir. 2010).

Before diving into the testimonial details, a quick word on what we mean by impermissible overview testimony. "The

prohibition on overly broad overview testimony arises from the basic principle in the Federal Rules of Evidence that witnesses, other than experts giving expert opinions, should testify from personal knowledge." Rosado-Perez, 605 F.3d at 55. And "[t]estimony by a law enforcement agent constitutes impermissible 'overview' testimony when it effectively opines that a defendant is guilty 'based on the totality of information gathered' in the agent's investigation, rather than relaying the agent's first-hand experiences and observations." García-Sierra, 994 F.3d at 26 (quoting United States v. Meises, 645 F.3d 5, 15 (1st Cir. 2011)).

With these principles in mind, we will address each witness and argument seriatim.

### i. Agent Wilkins

On the second day of trial, the government called Agent Richard James Wilkins, who was accepted as an expert in computer forensics without objection. Agent Wilkins testified that he extracted data from Ortiz's Samsung cell phone and sent that data to investigating authorities in San Juan. Wilkins explained the details of his extraction process and informed the jury that such extractions produced user accounts, chats, messages, call logs, images, videos, thumbnails, and internet search history from cell phones. When asked a follow-up question about the role of internet search history in child pornography investigations (which he had done hundreds of), Wilkins said that it "shows what somebody is

interested in, or what they are looking for, or what they are trying to do." On redirect examination, Wilkins elaborated on his process for connecting a specific user to a device based on extracted data. He told the jury:

> A phone, I'm not saying this phone, but many phones I analyze, what we will go and we will look for is email accounts, Facebook accounts, Instagram, and we find all of these accounts. Typically, they all come back to the same person. Maybe they have a different name on the account, but it comes back to the same subscriber ultimately.

That is the extent of Wilkins's testimony that Ortiz argues was impermissibly overbroad "personal opinion."

Even assuming Agent Wilkins's testimony amounts to lay opinion (rather than expert testimony of a computer forensics expert), the court did not commit an evidentiary error because Wilkins also testified to having years of experience and to having done hundreds of phone extractions. See United States v. Belanger, 890 F.3d 13, 25 (1st Cir. 2018) (explaining that lay witnesses may testify to expertise acquired through job experience). Wilkins's statements were logically connected to his experience and his personal involvement in extracting data from Ortiz's cell phone. See id. at 26. Moreover, Wilkins's testimony aided the jury's consideration of the extracted cell phone data that was later entered into evidence. See id. And, if more were needed, Ortiz has not argued (let alone proven) that Wilkins's testimony harmed

him.  See García-Sierra, 994 F.3d at 28.  Therefore, sans error or prejudice, Ortiz's challenge to Wilkins's testimony "falters on the shoals of plain error review."  Id. at 29.

### ii. Agent Segarra

Ortiz next claims the government's witness, Agent Darien Victor Segarra-Cardona ("Segarra"), "abandoned his expertise" and "advocate[d] from the witness stand."  Specifically, Ortiz argues that Segarra skipped over the details of his expertise and told the jury that he processed the seized cell phones "[t]o try to find evidence."  And when describing for the jury the evidence that he found (particularly photos), Segarra used the words "victims" and "child pornography."

At first glance, Segarra's testimony raises some concerns.  On direct examination, the government presented Segarra with an evidence disk he had prepared and asked him to state the names of the files therein.  Segarra identified fourteen files on the disk and rattled off the names he assigned to those files which included "child pornography" and "victims," along with more objective titles like "device photos" and "web history."  The government then asked Segarra whether those files were his personal findings related to his analysis, and he answered yes.

The government probed further into the files Segarra organized.  For the file titled "child pornography," Segarra testified the evidence consisted of "355 tags which contain images

of child pornography." Then, in similar fashion, the government asked Segarra to describe the "victims" file, and Segarra unsurprisingly said that it contained "[i]mages of the identified victims." Segarra further testified that he identified the photos of victims with help from Agent De Jesús (whose testimony we will be addressing shortly) and did so before the jury heard from Agent De Jesús or the victims.

A few things need unpacking before we can evaluate whether the court erred, let alone plainly erred, in admitting Segarra's testimony as Ortiz claims. First, unlike common examples of impermissible overview testimony, this is not an instance where one law enforcement officer testifies about the entirety of an investigation and evidence that had not been admitted. See United States v. Flores-De-Jesus, 569 F.3d 8, 17-18 (1st Cir. 2009) (discussing common examples of overview testimony). Agent Segarra's testimony commented on already-admitted evidence that he oversaw the extraction of and personally reviewed. Cf. García-Sierra, 994 F.3d at 26 (explaining that overview testimony is when a law enforcement agent "effectively opines that a defendant is guilty based on the totality of information gathered in the agent's investigation, rather than relaying the agent's first-hand experiences and observations" (citation modified)).

Second (as we mentioned before), so long as proper foundation is laid, "government witnesses may testify about

- 20 -

matters within their personal knowledge and give lay . . . opinion testimony." Rosado-Perez, 605 F.3d at 56. Segarra opened his testimony by telling the jury about his experience working for the Crimes Against Children Task Force as a computer forensics expert. He went on to inform the jury that he has worked on hundreds of cases involving child pornography and child exploitation, handled hundreds of cell phone extractions, and received specialized training to analyze extracted data in child pornography and child exploitation cases. So, when Segarra later testified to placing extracted cell phone data into files and titling one such file "child pornography," sufficient foundation had been laid to both his personal knowledge of how the data was produced and what he found when personally reviewing that data.

Lastly, even if Segarra's opinions as to what the content of the data revealed were problematic, Ortiz has failed to explain why this testimony prejudiced him considering the overwhelming evidence against him. See García-Sierra, 994 F.3d at 28 ("[O]n plain error review [the defendant] bears the burden of persuading us that the errors plaguing [the witness's] testimony harmed him."). Agent De Jesús testified after Segarra and identified the minor victims DAR, ARR, ACM, CAR, VOM, and ASR in the photos from the folder titled "victims." Furthermore, three of the six victims depicted in the "victims" file testified at trial and identified sexually explicit photos of themselves along with their

communications with Ortiz through the axilas Instagram accounts (DAR also identified photos of her younger sister).  Therefore, Segarra's testimony that the files contained child pornography and images of identified victims "was consistent with other competent evidence proffered by the government."  Id.[11]  Accordingly, Ortiz has not demonstrated that the district court committed plain error in allowing Segarra's testimony.

### iii. Agent De Jesús

The third and final witness Ortiz claims provided impermissible overview testimony is Agent Elizabeth De Jesús. According to Ortiz, De Jesús's expertise in child pornography should not have permitted her to "identify intimate body parts of strangers without establishing a basis for their ability to do so."  Furthermore, Ortiz says that the court should have prevented De Jesús from testifying to the "modus operandi"[12] of the individual behind the axilas accounts.

---

[11] To put a final nail in this coffin, Ortiz never argued or attempted to poke holes in the government's presentation of the extracted child pornography or the identification of the minor victims.  His theory of defense at trial (which he loosely carries on appeal) was that he was not the individual behind the axilas Instagram accounts, and that none of the evidence or testimony connected the offenses to him as the offender.  Based on this position, we are further convinced Segarra's testimony did not substantially affect Ortiz's rights.

[12] "Modus operandi" is Latin for "mode of operating" and legalese for a predictable pattern of behavior that indicates how an individual operates.

We will address the modus operandi claim first and explain why the district court did not plainly err. First off, we struggle to see how De Jesús's use of modus operandi falls under the ambit of impermissible overview testimony. Nevertheless, by our count, she spun this Latin phrase twice for the jury during her testimony. The first time, De Jesús explained that, after her investigation began, she received two additional complaints from the families of APR and ACM reporting an Instagram account "using the same modus operandi of requesting, soliciting underarm photographs from female minors and escalating it to solicit sexually explicit images from them." The second time, De Jesús explained that the second axilas Instagram account (identified via the additional complaints) "had the same modus operandi which was requesting underarm photos from female minors and progressively leading them to produce other images until it got to the point where they were being solicited for sexually explicit videos and/or images." She later described the same escalating pattern of requests that she observed in another complaint and when reviewing the axilas account records, but did not utter the words "modus operandi."

Both times De Jesús used the term modus operandi, she described a pattern of events that she personally observed and that the jury could later review in the evidence to reach the same (or a different) conclusion. See Rosado-Perez, 605 F.3d at 56

- 23 -

(finding a witness's testimony permissible where it was based on personal knowledge and the jury "could independently evaluate" the witness's interpretation). Furthermore, we find ourselves again in no position wherein we could somehow conclude that this testimony in some way prejudiced Ortiz. For example, De Jesús's use of the term modus operandi did not serve as a link between Ortiz's prior conduct and the alleged crimes. Cf. García-Sierra, 994 F.3d at 31 (discussing a challenge to prior-bad-acts evidence unrelated to overview testimony). The government connected Ortiz to the axilas Instagram accounts in a myriad of other ways including his email addresses used to access the accounts, the IP address connected to where he lived, and his seized cell phone used to access the accounts which also had sexually explicit images of victims downloaded from those accounts. In short, the court did not plainly err in allowing De Jesús to testify on the modus operandi she observed. See Flores-De-Jesus, 569 F.3d at 19 (distinguishing overview testimony from an agent's description of her investigation based on personal knowledge).

As for identifying victims, we again reject Ortiz's claim that De Jesús submitted impermissible overview testimony. On the third day of trial, De Jesús began her testimony by explaining how she got involved in Ortiz's case following the first complaint filed by KMC's school social worker. De Jesús then expounded on the search warrants she obtained for the axilas

Instagram accounts and how she reviewed the copious documents produced. Upon her review, she recognized messages to victims based on their complaints and discovered pornographic images of other minors who had not sought help. De Jesús personally combed through thousands of files to identify images of known victims and, using the victims' Instagram accounts contacted by the axilas accounts, De Jesús learned the identities of the previously unknown victims. From there, De Jesús told the jury that she personally met and saw all nine victims.

Still on direct examination, De Jesús explained how she processed all the Instagram data, burned it on to an evidence disk, and separated the documents into folders based on victim. She testified that she could organize the data by victim, in part because she knew which Instagram accounts the victims used to message and send photos to the axilas accounts. From the witness stand, she also identified each victim in photographs taken during interviews around the time the sexually explicit photos were taken and sent.

Even though De Jesús identified photos of the victims before they testified, De Jesús limited her testimony to her personal knowledge of evidence that had already been admitted. And, when "a law enforcement agent's testimony is limited to what [she] has gleaned from [her] first-hand observations, there is nothing wrong with the agent 'describing the course of [her]

- 25 -

investigation in order to set the stage for the testimony to come.'" García-Sierra, 994 F.3d at 27 (citation modified). However, from our read of the testimony, we agree with Ortiz that it is not always clear what images De Jesús was referring to while responding to questions. For instance, when asked about the Instagram records De Jesús received involving one axilas account and CAR's Instagram account, she seems to run through images with sporadic descriptions such as "[t]hose are images of CAR, her underarm followed by a photo of her breast," but then "[t]hose are genitals" or "[t]hese two images are of female genitals." But even with plausible error afoot (which itself falls short of the "obvious" requirement), Ortiz fails to explain, as is his burden, how this testimony harmed him. See id. at 28. Nor is such harm evident to us, particularly because many of the victims (aside from CAR and ASR) later proffered competent testimony and identified themselves in the photos they sent.[13] So, once again, Ortiz's claim succumbs to plain error review.

#### iv. Conviction on Count Seven

In presenting his overview testimony arguments, Ortiz also contends (somewhat confusingly) that this testimony allowed the jury to convict him of an offense involving a victim for which

---

[13] The youngest victim, ADMRR, did not testify at trial but was nevertheless identified by the competent testimony of someone with personal knowledge -- her older sister and fellow victim DAR.

there was no evidence. That offense, count seven of the indictment, accused Ortiz of producing child pornography involving "a nine (9) year-old female with initials AMR." Ortiz says that the evidence established that some victims had three-letter initials ending in "R" but that DAR testified her younger sister's initials were ADMRR. Therefore, according to Ortiz, his conviction must be reversed.

Ortiz raises this purported error as the consequence of impermissible overview testimony, but we've identified none of the sort. And to the extent Ortiz attempts to formulate a different argument based on the sufficiency of the evidence supporting count seven, he has not done so clearly and provided mere fleshless bones for that argument and thus waived that claim. See Zannino, 895 F.2d at 17.

### D. Juror Notes

We continue our march through Ortiz's appeal by reviewing what he considers to be three problematic juror notes submitted to the court during his trial. Because Ortiz failed to object to the district court's handling of these notes, his unpreserved claims receive plain error scrutiny at best (we say at best because, as the government points out and we will address momentarily, his acquiescence at trial drifts these claims toward outright waiver). See United States v. Cassiere, 4 F.3d 1006, 1017 (1st Cir. 1993); see also United States v. Corbett, 870 F.3d

- 27 -

21, 30 (1st Cir. 2017) (discussing the standard of review applicable to an unpreserved challenge to a response to a juror's question).

In our circuit, as we've previously explained, "[a]llowing jurors to pose questions during a criminal trial is a procedure fraught with perils. In most cases, the game will not be worth the candle." Cassiere, 4 F.3d at 1017 (alteration in original) (quoting United States v. Sutton, 970 F.2d 1001, 1005 (1st Cir. 1992)). In the same vein, trial judges possess "wide latitude to manage trials" and, despite the risks associated with allowing jurors to pose questions, the practice will not amount to reversible error if conducted properly based on the circumstances. Id. (quoting Sutton, 970 F.2d at 1005).

### i. Note 10

The first of three juror notes that Ortiz requests appellate examination of came to the court after the government's direct examination of Agent Segarra. This note sought clarification of a term Segarra used on the stand and asked (verbatim): "JB jail bate or jailbake at what is he referring to?" The court called counsel to sidebar, and said that it planned to ask Segarra what the initials "JB" meant to him personally before defense counsel started its cross-examination so that Segarra's answer could be subject to further questioning if warranted. Defense counsel responded, "No problem, sir," to this proposal.

- 28 -

The next day, as promised and before cross-examination began, the court asked Segarra, based on his knowledge and experience, what the term "jailbait" means and what the initials "JB" stand for. Segarra stated that JB is an abbreviation for jailbait, a term he'd seen used to search for images of pre-adolescent girls in explicit poses. Defense counsel did not object to either question nor to the response and proceeded with cross-examination of the witness.

Where, as here, "the district court unmistakably placed the issue of how to respond to" a "juror note on the table" and defense counsel "affirmatively stated that he had 'no problem' with the court's proposed response," the appellant has waived the issue. Corbett, 870 F.3d at 31; see also United States v. Chen, 998 F.3d 1, 9 (1st Cir. 2021) (finding challenges waived where counsel did not object and affirmatively accepted the court's proposals). Ortiz may not volte-face his prior position in this court.[14]

### ii. Note 12

The second of three juror notes at issue in this appeal confused both opposing counsel and the trial judge on first read

---

[14] Equally problematic, Ortiz concedes right in his opening brief that the district court's question and Segarra's response "[p]robably [did] not" "turn the tide" of his case, thereby eviscerating an essential prong of plain error review -- that an error was prejudicial and affected the proceeding's outcome. Galíndez, 999 F.3d at 65.

(admittedly, us too).  The district court understood the note to read: "I noticed a file that called my attention.  The name is Claro.  It concerns me that this supposed exposition of images of victims creates a risk of abduction."  Outside the presence of the jury, the district court proposed a solution to opposing counsel: it would explain to the note's author that they shouldn't be concerned for the safety of anyone in Puerto Rico and that this case was not about the Claro website (to be sure, neither is this appeal),[15] and then ask whether the juror had discussed their concerns with any other jurors and whether they could still be fair and impartial.  Both prosecution and defense agreed to this proposal.

    Later, the proposed plan proceeded without a hitch. Outside the presence of the other jurors, the court called the note's author (juror number 16, an alternate) and alleviated their concern.  The juror informed counsel and the court that they hadn't shared their thoughts with any other jurors and that they could still serve as a fair and impartial juror.  The audience ended without further comment, objection, or request made by defense counsel.

---

[15] For the curious reader, Claro is a telecommunications provider in Puerto Rico that offers mobile, internet, TV, and landline phone services and provides voice and data connectivity for residents and businesses.  It operates as part of the América Móvil group and evolved from the historic Puerto Rico Telephone Company.

Now, Ortiz claims error; however, he concedes "this incident itself does not warrant reversal."  Between defense counsel's acquiescence to the district court's response and Ortiz's concession on his meritless appellate position, Ortiz has abandoned, and thus waived, this claim.  See Corbett, 870 F.3d at 30; see also Zannino, 895 F.2d at 17 (explaining that our court will not do counsel's work and develop arguments).  And even setting all waiver aside, the court erred neither by responding to this juror note nor in the manner it responded.  Cf. United States v. Sandoval, 6 F.4th 63, 82 (1st Cir. 2021) (finding no error in the court's remedial actions where juror notes expressed fear, in the context of a motion for a mistrial).

### iii. Note 17

The third and final juror note poised for appellate scrutiny presents a deeper quagmire.  On the fifth day of trial, the court received a note that read:

> Is it necessary to listen to all the victims? We can tell, throughout the other interviews of witnesses, the process of getting these pictures.  There is a word.  It's by persistency and blackmailing, by actual threatening the witnesses.  There is plenty of evidence at hand.  What else is needed to provide a verdict for each count?  Can we proceed and simply have the Defendant testify? Please excuse my little prior knowledge of how a trial is completed.  I am just a bit impatient.

- 31 -

The court discussed this note with opposing counsel and proposed a response explaining that the government has the burden of proof and must present evidence as to each of the nineteen counts charged. Additionally, the court's proposed response stated that Ortiz had no obligation to testify and that no adverse inference or conclusion could be drawn from his decision not to. Lastly, the court told opposing counsel that he would inform the jurors that they must keep an open mind until all the government's evidence had come in and until it was time to deliberate. Throughout the conversation, at each step of the proposed response, defense counsel did not object; in fact, they expressly agreed.[16]

With the proper response settled, the court then asked opposing counsel, "Do we impart this to all the jurors?" Defense counsel said, "Why not? They are part of the instructions anyway." The government expressed cautionary concern because no one knew if the author of this note had shared their thoughts and impatience with other jurors. In response to the government's qualm, the court said that "[f]or the avoidance of doubt, I think it's better to impart it to all of them." And the jury was brought back in.

The court proceeded to read the note aloud to all jurors and swiftly quashed the sentiment raised according to the

---

[16] One slight caveat. Defense counsel asked the court to phrase Ortiz's right not to testify as his "decision" rather than the court's initial phrasing as his "failure" not to testify. The government and court agreed with this reasonable request.

agreed-upon response. After reading both question and response, the court once again asked opposing counsel for further input or objections. Neither party accepted the invitation, and the trial continued.

On appeal, Ortiz claims the note proved "disastrous pre-instruction deliberation by one juror" and the court's decision to read the note to the entire jury dealt a "mortal blow to the presumption of innocence." And due to this irreconcilable prejudice to Ortiz, he demands "[n]othing short of a new trial." The government offers three grounds for rejecting Ortiz's request: (1) his claims were affirmatively waived at trial (much like Ortiz's previous two challenges to juror notes); (2) under plain error review, Ortiz has failed to establish obvious error through binding precedent; and (3) the court's decision to read the note to all jurors was not prejudicial to him.

This time around, despite the general approval of the proposed response and lack of objection afterward, Ortiz did not intentionally relinquish or abandon a known right. See Corbett, 870 F.3d at 30-31. Unlike the previously discussed juror notes, the court's question "[d]o we impart this to all the jurors?" did not provide notice to counsel with sufficient clarity that the court intended to impart not only the approved response but also, the contents of the note itself. Thus, we disagree with the government's first response that Ortiz has waived this issue.

Still, Ortiz's lack of objection nevertheless leaves his claims to the perils of plain error review.  See, e.g., Chen, 998 F.3d at 7.

Recall that for us to grant the relief Ortiz seeks, he must prove: (1) that an error occurred (2) which was clear or obvious under binding precedent and not only (3) affected his substantial rights, but also (4) "seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id. (quoting United States v. Salley, 651 F.3d 159, 164 (1st Cir. 2011)).  To reverse on plain error review, the error below must be a "blockbuster" and sufficiently prejudicial to create a "reasonable probability that the outcome of the trial would have been different had it not occurred."  Id. (citation modified).

To meet the first prong of plain error review (that an error occurred), Ortiz appears to claim two separate errors entangled in this series of events, either of which he says warrant a new trial.[17]  First, he argues that this note evidenced "disastrous pre-instruction deliberation by one juror" and second, that it was error for the district court to "read the note aloud, contaminating all."  We will discuss each claim of error in turn.

Within Ortiz's first claim of error, we struggle to fully discern the extent of the alleged premature deliberations.  When

---

[17] We read Ortiz's briefing to make two separate claims of error involving this juror note; however, his blending of the inquiries and smattered legal citations complicates the endeavor.

first introducing this argument, Ortiz specifically accuses "one juror" of impermissible premature deliberation. Yet, like dancing the Bomba y Plena,[18] it typically takes more than one juror to deliberate and, thus, one juror cannot prematurely deliberate alone -- so long as they keep an open mind about guilt or innocence until the appropriate time. See McGonagle v. United States, 137 F. App'x 373, 377 (1st Cir. 2005) (explaining that "there is nothing wrong with jurors engaging in 'mental deliberations' during trial" so long as they keep an open mind); see also United States v. Esso, 684 F.3d 347, 351 (2d Cir. 2012) (finding "no harm" in individual jurors thinking about a case and engaging in "private 'deliberations'" with themselves). And here, while the juror note uses inflammatory terms like "blackmailing" and "plenty of evidence," the note posed two questions indicating a still-existent open mind. Contrary to Ortiz's version of the note, it did not say the evidence at hand was sufficient to "convict," but instead used "verdict" in formulating a question. Moreover,

---

[18] Bomba y Plena are vibrant, percussion-driven Afro-Puerto Rican musical traditions, often grouped but distinct, rooted in the experiences of enslaved Africans, serving as powerful expressions of culture, resistance, and community storytelling through unique rhythms, call-and-response singing, and dance. Bomba, older and with West African roots, features dynamic drumming (barriles) and dancer-drummer interactions. Plena, from the early 20th century, acts as the "sung newspaper," telling stories of daily life with pandereta drums.

the fact that the juror asked if the defendant could testify demonstrates that they felt Ortiz's fate hadn't been sealed.

A subtle switch emerges in Ortiz's reply brief. There, he expands the scope of this claim of error to premature deliberations between multiple jurors. But neither Ortiz nor the government asked the court to question the author of the juror note about whether they'd shared their thoughts with other jurors. Consequentially, the record is silent on whether any premature discussions took place between the author of this juror note and any of the other jurors, and the note itself does not prove otherwise. Cf. United States v. Jadlowe, 628 F.3d 1, 21 (1st Cir. 2010) (concluding the record was silent regarding premature deliberations despite a flawed instruction permitting discussions between jurors during trial).

What we can gleam from the record is that, consistent with what had been agreed upon at least in part, after reading the note aloud, the district court explicitly informed the jury that the government needed to present evidence of each count and that every juror needed to keep an open mind until all evidence had been presented and until they retired to deliberate. "Pursuant to well-established precedent, we presume juries understand and follow the court's instructions." Id. (citation modified). As such, without indication to the contrary, we presume the author of this juror note did not prematurely deliberate or express their

opinions of Ortiz's guilt or innocence with their peers. See id. at 22. So, whichever way Ortiz slices his premature deliberation claim, we see no error warranting a new trial.

For Ortiz's second claim of error stemming from the same juror note, he appears to argue the court's reading aloud of the note destroyed the presumption of innocence that he is constitutionally entitled to.[19] Ultimately, we find the district court's reading of the juror note did not corrupt Ortiz's presumption of innocence nor did it implicate his Sixth Amendment right to a fair trial.

Before going any further, our forthcoming analysis does not endorse the court's decision to read the note to the jury, nor suggest it could not have been handled better. Any possible negative implications from reading the note could have been avoided by either only imparting the agreed-upon response to the entire jury or calling the author of the note aside for further inquiry. However, we recognize "[j]udges, like the rest of humankind, are not perfect" and inadvertent mistakes unavoidably crop up on occasion. United States v. Maguire, 918 F.2d 254, 267 (1st Cir.

---

[19] The heading of Ortiz's brief frames all juror-note related arguments as falling under the Sixth Amendment right to a fair trial and Fifth Amendment "rights to remain silent and the presumption of innocence." Yet at oral argument, Ortiz classified this argument for the first time as raising due process concerns; that's too late, meaning the due process aspect is waived. E.g., United States v. Calderon-Zayas, 102 F.4th 28, 37 n.9 (1st Cir. 2024).

1990); see also United States v. Espinal-Almeida, 699 F.3d 588, 608 (1st Cir. 2012) (finding a judge's possibly "inappropriate commentary" permissible because "a criminal defendant is entitled to a fair trial, not necessarily a perfect one" (citation modified)).

Nevertheless, the question before us is whether this misstep presents an error of constitutional magnitude. Maguire, 918 F.2d at 267. And, as we've previously held, some inadvertent missteps fall short of the constitutional threshold and can be corrected without prescribing the strong medicine of a new trial. See id. (rejecting a claim for a new trial where the district court erroneously read a severed count of the indictment to the jury); see also United States v. Rosario-Pérez, 957 F.3d 277, 296 (1st Cir. 2020) (affirming the denial of defendant's mistrial motion where the district court referenced a potential appeal in front of the jury). Here, the district court read the juror note in the context of its immediate curative instruction without objection. That instruction clearly and concisely explained the relevant law including that no negative interference could come from Ortiz's decision not to testify. The court later reiterated in its final charge to the jury the importance of the presumption of innocence and that Ortiz had a constitutional right not to testify. Emphasizing the latter point, the court cautioned the jury that

drawing any negative inference from Ortiz's decision not to testify would violate the oath they had taken as jurors.

Due to these remedial measures taken by the court after reading the note aloud, Ortiz has not presented a clear or obvious error warranting a new trial.  See United States v. Polito, 856 F.2d 414, 419 (1st Cir. 1988) ("[T]he strong, firm, and twice-repeated prophylactic instructions were adequate to dispel any possible damage.").  The court's curative instructions -- immediately ensuing the reading of the note and repeated before the jury retired -- left no doubt that Ortiz had a constitutional right not to testify and that he was entitled to an unwavering presumption of innocence.  Furthermore, the complete lack of objection to the instructions "deprived the trial judge of an earlier opportunity to fully evaluate the effect of his . . . comments upon the jury" and "further militates against a finding of reversible error."  United States v. Ayala-Vazquez, 751 F.3d 1, 25 (1st Cir. 2014).  Thus, on this record, we perceive no clear or obvious error.

### E. Double Jeopardy

As we mentioned in our recapitulation of the events leading to Ortiz's present appeal, the jury (after deliberating) returned guilty verdicts for all nineteen counts charged in the indictment.  Ortiz alleges that some of these counts impermissibly punished him twice for the same conduct -- thereby violating the

- 39 -

Fifth Amendment's Double Jeopardy Clause. Because Ortiz did not object or raise this claim at trial, we (again) review for plain error. United States v. Henry, 519 F.3d 68, 71 (1st Cir. 2008).

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. We have drawn three general protections from this text: "it shields a defendant from a second prosecution for the same offense after either conviction or acquittal, and it also prohibits multiple punishments for the same offense." United States v. Pacheco, 434 F.3d 106, 111-12 (1st Cir. 2006) (quoting United States v. Morris, 99 F.3d 476, 478 (1st Cir. 1996)). Ortiz invokes the third class of protection by claiming he has received multiple punishments for the same conduct.

To remind the reader, Ortiz was charged and convicted of nine counts of production of child pornography in violation of 18 U.S.C. § 2251(a), eight counts of coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b)(2), one count of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2), and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). He asserts two separate double jeopardy violations: first, that possession of child pornography is a lesser included offense of receiving child pornography and second, that because the production of child pornography served as a necessary element to convict him of coercing and enticing a minor, the former

- 40 -

was a lesser included offense of the latter. For reasons that we will soon provide the reader, we agree with Ortiz's first constitutional contention and reject his second.

Resolving Ortiz's claims first requires an application of the "Blockburger test" (otherwise known as the "same-elements test"). Rodríguez-Méndez v. United States, 134 F.4th 1, 6 (1st Cir. 2025) (quoting United States v. Dixon, 509 U.S. 688, 696 (1993)). This nearly-century-old test helps settle whether two offenses are really just one (and, thus, warrant just one punishment) by determining if each offense requires proof of a fact that the other does not. Id.; accord Rutledge v. United States, 517 U.S. 292, 297 (1996). In applying this test, if one offense is a lesser included offense of the other, we say the two amount to the "same offense" and thus pose a constitutional problem in the presence of two convictions. Rutledge, 517 U.S. at 297. But, if "[e]ach of the offenses created requires proof of a different element," they are not the same offense and there is no Double Jeopardy Clause violation. Blockburger v. United States, 284 U.S. 299, 304 (1932); see also Barrett v. United States, 146 S. Ct. 482, 491 (2026) (explaining that "the inquiry generally ends" if the relevant offenses satisfy the Blockburger test).

Where two statues define the same offense, "the Blockburger presumption is triggered" and we presume "that Congress ordinarily does not intend to punish the same offense

- 41 -

under two different statutes." Barrett, 146 S. Ct. at 491 (citation modified). But this presumption may ultimately yield to a "plainly expressed" intent from Congress to abandon it. Id. (citing Garrett v. United States, 471 U.S. 773, 778-79 (1985)). In other words, if two statues share common elements, such that neither requires proof of a distinct element, we "search for a clear manifestation of Congress's intent to authorize more than one punishment." Id. Sans that requisite congressional intent, the Blockburger presumption holds, and the multiple convictions will be unlawful.

### i. Possession and Receipt

Ortiz first argues that his separate convictions for the possession and receipt of child pornography violate the Double Jeopardy Clause because possession is a lesser included offense of receipt. Ortiz's claim has logical fortitude and persuasive support from our sister circuits who have previously pondered this question, including under plain error review. See United States v. Muhlenbruch, 634 F.3d 987, 1002-04 (8th Cir. 2011); United States v. Miller, 527 F.3d 54, 73 (3d Cir. 2008). His argument, which relies on those circuit cases and the Supreme Court's decision in Ball v. United States, builds off a basic premise: one who receives something (including child pornography) necessarily possesses that item, at least at the moment of receipt. See Ball v. United States, 470 U.S. 856, 861 (1985) (holding that Congress

did not intend to punish an individual for both possession and receipt of a firearm because "proof of illegal receipt of a firearm necessarily includes proof of illegal possession of that weapon"); United States v. Bobb, 577 F.3d 1366, 1372 (11th Cir. 2009); United States v. Davenport, 519 F.3d 940, 943 (9th Cir. 2008); see also United States v. Johnston, 789 F.3d 934, 938 (9th Cir. 2015) ("A majority of circuits that have considered the question agree that possession of child pornography is a lesser included offense of receipt and that imposing convictions under both statutes for the same conduct violates the Double Jeopardy Clause. Two additional circuits have signaled their agreement . . . without explicitly deciding the issue."). Based on that caselaw, Ortiz asserts that the error of his two convictions for possessing and receiving child pornography is "legally obvious under established law." See Miller, 527 F.3d at 73 (analogizing to Ball to conclude that entering separate convictions for possession and receipt of child pornography was plain error).

The government acknowledges that several courts of appeals have found the possession of child pornography to be a lesser included offense of receipt. Nevertheless, it argues no error occurred because separate facts and evidence support Ortiz's separate possession and receipt convictions, thereby avoiding any double jeopardy complications.

- 43 -

The government peddles this "separate evidence" theory for the first time before our court. The basic idea behind this theory is that Ortiz received child pornography from his minor victims but possessed separate child pornography depicting other minors on his cell phones when they were seized. From our review of the record, the government's separate evidence theory has legs. It appears that Ortiz possessed separate images that could have formed the basis of a distinct possession conviction. The problem is that the government never (despite numerous opportunities) prosecuted Ortiz's possession charge based on those images of minors other than his victims.

Other courts have accepted a separate evidence justification when considering the same double jeopardy issue raised by Ortiz, and those courts appropriately upheld multiple convictions for the possession and receipt of child pornography where separate evidence formed the basis of each conviction. United States v. Halliday, 672 F.3d 462, 471 (7th Cir. 2012); see also United States v. Schnittker, 807 F.3d 77, 83 (4th Cir. 2015) ("The federal courts of appeals have relied on various manifestations of distinct conduct to determine that separate counts were not the same in fact."). But, unlike the circumstances where courts have affirmed multiple convictions based on separate evidence (and thus avoided this double jeopardy issue), the current record does not provide a basis for us to conclude that Ortiz's

- 44 -

possession and receipt convictions were based on separate evidence. See United States v. Benoit, 713 F.3d 1, 17 (10th Cir. 2013) ("Based on the entire record, it is abundantly clear that the jury convicted [the defendant] of both receipt and possession based on the same visual depictions."); United States v. Schales, 546 F.3d 965, 980 (9th Cir. 2008) (holding that "[o]n this record, we cannot conclude that [the defendant] was convicted for separate conduct" after scrutinizing the indictment, jury instructions, and verdict form). Several happenings below lead us to this result.

First, neither count twelve (receipt)[20] nor count thirteen (possession)[21] of the indictment charged Ortiz with distinct conduct specific to each offense. Particularly, both counts refer to an overlapping time period and similar conduct through the vehicle of his cell phones that could have been proven by the government with the same evidence. Compare Benoit, 713 F.3d at 17 (finding the government failed to charge the defendant "for two distinct acts" in the indictment), with Bobb, 577 F.3d at 1375 (referencing an indictment's distinct dates for two separate

---

[20] Count twelve alleged that Ortiz "received images depicting actual minor females engaged in sexually explicit conduct via internet instant messaging services and social media messages using his cellular phones" from "in or about August, 2019 through in or about May, 2020."

[21] Count thirteen alleged that Ortiz "possessed still images depicting minors engaged in sexually explicit conduct on his cellular phones" from "in or about August, 2019 through on or about June 10, 2020."

offenses), and United States v. Sturm, 673 F.3d, 1274, 1288 (10th Cir. 2012) (finding a defendant was properly convicted of distinct possession and receipt offenses, in part, due to the fact that "the indictment charged him with knowing possessing of three specific images of child pornography").

Second, the government did not specify in its opening or closing arguments that certain images formed the basis of the possession count and that other images were to be considered as the basis for the receipt count. This is not to suggest that the government's arguments are evidence, but we recognize that other courts have accepted clear prosecutorial arguments that tethered separate evidence to separate charges as proof that the jury did not impermissibly base multiple convictions on the same evidence. Halliday, 672 F.3d at 471; see also Johnston, 789 F.3d at 939 (rejecting the government's separate conduct theory, in part, because "[t]he prosecutor repeatedly referred to the receipt and possession counts in the same breath without any indication that the jury was required to consider separate conduct for each count"). Although the government mentioned in its closing argument the existence of child pornography that Ortiz possessed not depicting his victims, it told the jury "[a]s to the count relating to possession of child pornography, it would both include the images he possessed of the identified minors and any additional images of child pornography that were found in the phone devices."

Likewise, the government also stated in its closing remarks that "the count relating to receipt of child pornography, it includes any and all images that were received of child pornography during that span of time." These statements leave us far from convinced that the prosecution clarified its separate evidence theory for the jury, or that the jury returned its guilty verdict on count thirteen based on Ortiz possessing separate images not depicting his victims.[22]

Furthermore, neither the jury instructions nor the verdict form made any distinction as to what evidence should have been separately considered for Ortiz's receipt and possession charges. Cf. Sturm, 673 F.3d at 1288 ("The jury was specifically instructed as to which images were associated with which count, and found [the defendant] guilty on both counts."). So, after combing through the record, we cannot conclude that Ortiz was convicted of receiving and possessing child pornography based on separate evidence. See Schales, 546 F.3d at 980.

Beyond its separate evidence theory, the government does not advance any argument in the alternative that Ortiz's

---

[22] The government also argued (out of the jury's presence) that the court could consider all the child pornography Ortiz received and possessed during the time span identified in the indictment when opposing Ortiz's Rule 29 motion for judgment of acquittal. The relevance being, the government was not pursuing convictions based on the separate evidence theory that it now raises to fend off Ortiz's double jeopardy claim.

convictions for both possession and receipt of child pornography is not a double jeopardy violation. Nor does it dispute that such violation is not clear or obvious. Therefore, "the government has waived th[ose] backup position[s]." United States v. Ramos-Gonzalez, 775 F.3d 483, 506 (1st Cir. 2015) (applying appellee waiver on plain error review). Accordingly, we conclude that Ortiz has satisfied the first two plain-error prongs.

Moving to the third plain-error prong, the separate convictions for possession and receipt of child pornography were prejudicial to Ortiz. To be clear, the court imposed 240-month sentences for Ortiz's possession and receipt convictions to be served concurrently with his 360-month sentence imposed for his remaining convictions. So, Ortiz wouldn't have spent any additional time incarcerated due to the separate possession and receipt convictions. However, as the Court stated in Ball, "[t]he second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence." 470 U.S. at 864-65. Various potential adverse consequences can follow from the additional conviction, id., not to mention the fact that the district court ordered Ortiz to pay a mandatory $100 special assessment for each conviction, see Muhlenbruch, 634 F.3d at 1004. The government does not contend otherwise. Thus, the double jeopardy violation at issue subjected Ortiz to multiple punishments and prejudiced him as a result.

On our last stop in the plain-error gauntlet, we further conclude this error threatens the fairness, integrity, and public perception of our judicial system. To borrow the persuasive reasoning of our sister courts, "because the prohibition against double jeopardy is a cornerstone of our system of constitutional criminal procedure, this error threatens the fairness, integrity, and public reputation of our judicial proceedings." Davenport, 519 F.3d at 947-48. We agree with this sentiment, and, again, the government makes no contrary argument.

To close the loop on this issue, we reject the government's separate evidence theory raised on appeal and find that Ortiz's separate convictions for receiving and possessing child pornography violate the Double Jeopardy Clause. The government opted to paint a broad picture for the jury: Ortiz received child pornography from his minor victims and was found in possession of the same. This prosecutorial decision was well within the government's discretion, as was the choice not to limit the possession and receipt charges to specific evidence. See Garrett, 471 U.S. at 789 n.2 ("The Government . . . is responsible for initiating a criminal prosecution, and subject to applicable constitutional limitations it is entitled to choose those offenses for which it wishes to indict and the evidence upon which it wishes to base the prosecution."). But that decision denied Ortiz the opportunity to mount a separate defense in opposition to the

government's separate evidence theory.  See Price v. Georgia, 398 U.S. 323, 331 (1970) ("The Double Jeopardy Clause, as we have noted, is cast in terms of the risk or hazard of trial and conviction, not the ultimate legal consequences of the verdict.").

As a result, we adopt "the most salubrious course" and remand to the district court to vacate Ortiz's conviction and sentence, including the $100 special monetary assessment, for either count twelve or count thirteen.  United States v. Chiaradio, 684 F.3d 265, 284 (1st Cir. 2012); Rutledge, 517 U.S. at 307 ("Accordingly, one of petitioner's convictions, as well as its concurrent sentence . . . must be vacated." (citation modified)).  Because Ortiz was sentenced to 360 months' imprisonment on the remaining seventeen counts, this remedy would likely only require a monetary adjustment on remand for the district court to enter judgment consistent with this opinion.  United States v. King, 554 F.3d 177, 181 (1st Cir. 2009).[23]

### ii. Production and Coercion

Ortiz's second double jeopardy claim involves his convictions for the production of child pornography and the

---

[23] To preview our forthcoming conclusions on Ortiz's second double jeopardy challenge and his challenge to the substantive reasonableness of his 360-month sentence, his remaining convictions and sentence may stand.  The district court may resentence Ortiz on the surviving eighteen counts, or, in the alternative, allow the sentences on those counts to remain intact. Chiaradio, 684 F.3d at 284.

coercion and enticement of a minor.  Here, Ortiz claims that the district court erred by allowing his production convictions to serve as essential elements of proof that he coerced or enticed minors -- thereby turning the production of child pornography into a lesser included offense of coercing and enticing a minor.  But unlike his previous double jeopardy claim, Ortiz has failed to establish error because the statutes for producing child pornography and coercing and enticing a minor do not trigger the Blockburger presumption.

To apply the Blockburger test, we turn our attention to the statutes of conviction.  See United States v. Morris, 99 F.3d 476, 479 (1st Cir. 1996) ("[T]he Blockburger rule depends on statutory analysis, not on evidentiary comparisons.").  The offense of producing child pornography in violation of 18 U.S.C. § 2251(a) requires proof of the following:

(1)  the defendant employed, used, persuaded, induced, enticed, or coerced a minor to engage in any sexually explicit conduct;

(2)  the defendant engaged in this act for the purpose of producing a visual depiction of such conduct; and

(3)  the defendant knew or had reason to know that the visual depiction would be transported or transmitted using any means or facility of interstate or foreign commerce.

Meanwhile, the offense of coercion or enticement of a minor in violation of 18 U.S.C. § 2422(b) requires proof that:

(1)  the defendant knowingly persuaded, induced, enticed, or coerced;

(2)  through the mail or any facility or means of interstate or foreign commerce;

(3)  any individual who has not attained the age of 18 years;

(4)  to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense.

In resolving Ortiz's claim, we join the three circuits to have considered this question and find that the production of child pornography offense and the coercion or enticement of a minor offense each require proof of an element that the other does not. See United States v. Sanchez, 30 F.4th 1063, 1077 (11th Cir. 2022); United States v. Isabella, 918 F.3d 816, 848-49 (10th Cir. 2019); United States v. Hart, 635 F.3d 850, 858 (6th Cir. 2011). The production of child pornography offense requires the government to prove that an individual acted intentionally to produce a visual depiction, a fact not required for the coercion or enticement of a minor offense. Compare 18 U.S.C. § 2251(a), with id. at § 2422(b). The coercion or enticement of a minor offense requires the government to prove that the defendant knowingly coerced a minor to engage in "any sexual activity for which any person can be charged with a criminal offense," a fact immaterial to proving

- 52 -

the elements of the production offense. Compare 18 U.S.C. § 2422(b), with id. at § 2251(a). See Hart, 635 F.3d at 858 (drawing the same distinction). Because these two offenses require proof of a fact that the other does not, they are separate offenses and Ortiz's convictions do not offend the Double Jeopardy Clause. See, e.g., Rodríguez-Méndez, 134 F.4th at 6.

Not so fast, says Ortiz. The government proved the "criminal offense" element of the coercion offense only with evidence that he produced child pornography making the two offenses, in effect, the same offense. Not quite. For starters, multiple convictions for the same conduct are permissible so long as the charged offenses require the government to prove different elements (i.e., so long as they pass the same-elements/Blockburger test). See id. at 6 n.3; see also United States v. Sepulveda, 102 F.3d 1313, 1316 (1st Cir. 1996) ("[A] defendant can be convicted of two differently defined offenses, based on the same core of facts, so long as each offense requires an element that the other does not."). Under similar circumstances (legally, not factually, speaking) we held a defendant could be prosecuted under the fugitive in possession of a firearm statute despite an earlier conviction for failing to appear before the court. See United States v. Colon-Osorio, 10 F.3d 41, 46 (1st Cir. 1993). In that instance, after faithfully applying the Blockburger test, we determined that the same conduct of "bail jumping" could

- 53 -

simultaneously establish both the elements of the failing to appear offense and the "fugitive" element of the fugitive in possession offense, without implicating double jeopardy. See id. at 45. Similarly, Ortiz's repeated requests for sexual images of his minor victims (his conduct) can establish the required elements of the production of child pornography offense while also serving as an element in proving the coercion or enticement of a minor. So, Ortiz has failed to show a double jeopardy violation occurred and his convictions for these offenses stand.

## F. Sentencing

In the last leg of Ortiz's appeal, he challenges the substantive reasonableness of his 360-month sentence.[24] Because Ortiz argued for a shorter sentence before the district court, he preserved this challenge and, therefore, we review for abuse of

---

[24] Because Ortiz's sentencing claim relates only to the substantive reasonableness of his 360-month sentence, we see little reason not to address this fully briefed and argued issue despite our decision to remand for the district court to vacate either Ortiz's possession or receipt conviction. Cf. United States v. Mercedes-De La Cruz, 787 F.3d 61, 70 (1st Cir. 2015) (resolving a claim of sentencing error despite vacating defendant's conviction). To reorient the reader, the district court ordered Ortiz to a term of 360 months' imprisonment for counts one to eleven and counts fourteen to nineteen, with concurrent terms of 240 months' imprisonment for counts twelve and thirteen (the receipt and possession counts). Ortiz does not challenge his 240-month sentences, and we reject his claim of substantive reasonableness so that the district court may choose at its discretion to leave his 360-month sentence in place on remand. Chiaradio, 684 F.3d at 284.

discretion.  United States v. Melendez-Hiraldo, 82 F.4th 48, 56 (1st Cir. 2023).

The twin pillars of a substantively reasonable sentence are a plausible rationale from the sentencing court and a defensible outcome.  See, e.g., United States v. Colcord, 90 F.4th 25, 30 (1st Cir. 2024).  And for any given defendant there exists "a universe of reasonable sentencing outcomes."  Id. (quoting United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011)).  Our role is not to second-guess a sentencing court's reasoned judgment, but to correct a sentence only if it lies beyond the expansive boundaries of the universe of reasonable sentences.  United States v. Matos-de-Jesús, 856 F.3d 174, 179-80 (1st Cir. 2017).  Lastly, we add that Ortiz faces a particularly heavy burden to prove his sentence is unreasonable because he challenges a downwardly variant sentence from the sentence calculated using the United States Sentencing Guidelines ("Guidelines").  See United States v. Concepcion-Guliam, 62 F.4th 26, 36 (1st Cir. 2023).

To attempt to meet that heavy burden, Ortiz argues that the district court's downward variance represented a "wide-spread rejection of the Guidelines," but the court failed to "acknowledge factors that mitigate this offense and offender."[25]  But, contrary

---

[25] Ortiz also refences various statistics and studies on district courts' rejections of Guidelines sentences for child pornography production.  We too have recognized this trend.  See Colcord, 90 F.4th at 31 & n.2.  But the fact that Ortiz's sentence

to Ortiz's vantage, our review of the sentencing transcript indicates due consideration of both offense and offender. At Ortiz's sentencing hearing, the court provided a thorough recitation of its reasoning. It first noted the Presentence Investigation Report correctly calculated a Guideline imprisonment term of life.[26] The court then acknowledged Ortiz's mental health and medical conditions, his dependent daughter, his limited criminal history, his family ties, and his employment history. However, the court also weighed "the heinous nature and circumstances of the offense" which involved "nine female minor victims who were coerced into taking pornographic images under circumstances that evidenced great malice and cruelty." Given the court's attention to the relevant factors and the Guidelines, we cannot give credence to Ortiz's assertion that "[t]he record holds no answer" as to why he received a thirty-year sentence.

Likewise, the court's imposed sentence represents a defensible result. In just a few months, Ortiz contacted and coerced eight minor females into sending him sexually explicit photographs. Ortiz began by requesting photos of victims' armpits,

―――――――――――――――――

exceeds the out-of-context average he cites, alone, does not make the district court's judgment unreasonable. See id. (explaining that there is no requirement for a district court to conform to the categorical policy disagreements of other courts).

[26] Ortiz has not appealed the calculation of the Guidelines sentencing range.

sometimes with the promise of payment. After receiving armpit photos, he would post the pictures to his Instagram page often tagging the minor victims. When the minors asked Ortiz to remove the posts, he said only in exchange for more photos, but this time of their faces, breasts, and genitals. After Ortiz convinced his victims to send sexually explicit images, he once again escalated his demands for more pictures (including pictures of one victim's younger sister) and videos of his victims masturbating (a word he often had to explain to his unaware victims). When Ortiz's victims resisted and pleaded for him to stop, he threatened to post their nude photos on the internet or send them to the victim's classmates, and the latter threat he followed through on by disbursing nude images of KMC to her peers. Ortiz also took the opportunity to send one eleven-year-old victim images of his penis.

Based on the district court's reasoned consideration of the relevant factors, and the facts of Ortiz's offenses, we cannot say that his downwardly-variant sentence stretched beyond the universe of reasonable sentences. See Concepcion-Guliam, 62 F.4th at 36.

### III.

For the reasons elucidated above, we reject all of Ortiz's claims of error, except for his double jeopardy claim pertaining to counts twelve and thirteen.

- 57 -

**Affirmed** in part and **remanded** for further proceedings consistent with this opinion.